## KINKEAD *v.* UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 83. Argued November 15, 1893. — Decided December 4, 1893.

The court of claims was not estopped by the recitals in the act of January 17, 1887, 24 Stat. 358, c. 21, referring this case to it, from considering the question of the title of the claimants to the property whose value is sought to be recovered.

The commissioners appointed by the governments of the United States and
of Russia for the transfer of Alaska under the treaty of March 30, 1867,
15 Stat. 539, had no power to vary the language of the treaty or to deter-
mine questions of title or ownership.

The building constructed by the Russian-American Company in 1845 on
land belonging to Russia became thereby, so far as disclosed by the
facts in this case, the property of the Russian government, and, being
transferred to the United States by the treaty of March 30, 1867, no
property or ownership in it remained in the Russian-American Com-
pany, which it could transfer to a private person adversely to the United
States.

THIS was a petition by John H. Kinkead and Samuel Suss-
man, claiming to be the owners and lawfully possessed of a
certain warehouse in Sitka, Alaska, for the rent of a part of
such warehouse at the rate of $200 per month, from December
15, 1868, to December 15, 1888, the date of the petition,
amounting to $48,000; and also the further sum of $69,300
for rent of another part of the same building from September
12, 1869, to December 15, 1888; together with the further sum
of $50,000 for the value of the building; the aggregate amount
of the claim being $167,300.

Petitioners claimed to have purchased the building from the
Russian-American Company, through Prince Maksoutoff, chief
factor, for the sum of $3000 in gold.

A former petition for the same claim had been presented to
the Court of Claims and dismissed by it for want of jurisdic-
tion, upon the ground that, as the title set up by the claimants
depended upon the construction of the treaty between the
United States and the Emperor of Russia, the court was with-
out jurisdiction over the same. 18 C. Cl. 504. Whereupon
claimants procured the passage of an act of Congress approved
January 17, 1887, referring their claim to the Court of Claims
for adjudication.

The petition under consideration having been heard, the
court made a finding of facts, the substance of which appears
in the opinion of this court, and entered a judgment dismissing
the petition upon the ground that Kinkead and Sussman had
no title to the property in question. From this judgment
petitioners appealed to this court.

*Mr. George A. King* and *Mr. Joseph K. McCammon,* (with whom was *Mr. John Mullan* on the brief,) for appellants.

*Mr. Assistant Attorney General Dodge* for appellees.

MR. JUSTICE BROWN, after stating the case as above, delivered the opinion of the court.

Petitioners' title to the building in question, which they claim to have bought of the Russian-American Company, a Russian corporation, soon after the cession of Alaska to the United States, depends upon the construction to be given to the treaty of March 30, 1867, between His Majesty the Emperor of Russia and the United States, 15 Stat. 539, the correspondence and protocol connected therewith, and the act of Congress of January 17, 1887, referring this claim to the Court of Claims for adjudication. Upon the hearing in the Court of Claims, the court found " that at the time Alaska was ceded by Russia to the United States there was standing on a certain lot adjacent to the public wharf in the town of Sitka a building, constructed of hewn logs, 118 feet in length and 50 feet in width. The land upon which this building stood belonged to Russia, and was thus embraced in the cession to the United States."

This building was erected in 1845 by the Russian-American Company, at their own expense, and from that time to the date of the treaty had been used by said company as a warehouse for the storage of furs and other property, and for trading purposes.

By what authority from Russia this land was built upon and occupied by said company, further than is shown in finding II, (which relates solely to proceedings taken for the transfer of the ceded territory,) " does not appear."

By the first article of the treaty the Emperor makes cession of " all the territory and dominion now possessed by his said Majesty on the continent of America, and in the adjacent islands, the same being contained in the geographical limits herein set forth, to wit : " (Boundaries.)

The second article provided that " in the cession of the territory and dominion made by the preceding articles are included the right of property in all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices which are not private individual property."

Article four provides for the appointment of an agent for each government for the purpose of making and receiving formal delivery of the ceded territory, and " for doing any other act which may be necessary in regard thereto." " But the cession, with right of immediate possession, is nevertheless to be deemed complete and absolute on the exchange of ratifications, without waiting for such formal delivery."

Article six provides that " the cession of territory and dominion herein made is hereby declared to be free and unencumbered by any reservations, privileges, franchises, grants, or possessions, by any associated companies, whether corporate or incorporate, Russian or any other, or by any parties, except merely private individual property holders."

. It should be added in this connection, and as explanatory of the sixth article of the treaty, that on March 23, 1867, Mr. Seward, then Secretary of State of the United States, addressed a letter to the Russian minister in which he stated: " I must insist upon that clause in the sixth article of the draft which declares the cession to be free and unencumbered by any reservations, privileges, franchises, grants, or possession by any associated companies, whether corporate or incorporate, Russian or any other, etc., and must regard it as an ultimatum. With the President's approval, however, I will add two hundred thousand dollars to the consideration money on that account." To this letter the Russian minister made reply that he believed himself " authorized to accede literally to this request on the conditions indicated " in the note of the Secretary.

In pursuance of the fourth article of the treaty, the President appointed General Rousseau commissioner to receive the formal transfer of the ceded territory, with instructions to " enter into communication with Captain Pestchouroff, the Russian commissioner, now here, and arrange with him with

regard to proceeding as soon as may be convenient to the territory, etc. . . . Pursuant to the stipulations of the treaty that transfer will include all forts and military posts and public buildings, such as the governor's house and those used for government purposes, dock-yards, barracks, hospitals, and schools, all public lands, and all ungranted lots of ground at Sitka and Kodiak. Private dwellings and warehouses, blacksmiths', joiners', coopers', tanners', and other similar shops, ice-houses, flour and saw-mills, and any small barracks on the island are subject to the control of their owners, and are not to be included in the transfer to the United States."

The commissioners were further instructed to draw up and sign full inventories, distinguishing between the property to be transferred to the United States and that to be retained by individuals; and were also instructed to furnish the proprietors of individual property with a certificate of their right to hold the same upon production of documentary or other proof of ownership.

"As it is understood that the Russian-American Company possess in that quarter large stores of furs, provisions, and other goods now at Sitka, Kodiak, and elsewhere on the main land and on the island, it is proper that that company should have a reasonable time to collect, sell, or export that property. For that purpose the company may leave in the territory an agent or agents for the purpose of closing their business."

In his report of his proceedings, General Rousseau stated: "I found that by the charter of the Russian-American Company it had authority to vest in its employés, occupants of land in the territory, the title thereto. This was on condition, however, that the possessions of the Indians should not be interfered with.

"Acting under this charter, the company from the first caused dwellings to be erected for the use of its employés on lots of ground set apart for the purpose. The title in fee to such premises was often vested in the employé in possession when he had faithfully served out his term in the company, or, having died before it ended, and having a widow or

children in the territory, the title was frequently vested in them.

"Finding in its charter this authority of the company to vest title to land in its employés, and that very many of the dwellings erected by the company were occupied by employés or their widows and children, who claimed the property in fee, the commissioners called on the governor, Prince Maksoutoff, to define and certify to the interest of each individual thus occupying such dwellings and lots, in order that we might distinguish between those who owned the property in fee and those who claimed a less interest, and in compliance with your instructions give certificates to the claimants accordingly.

"The inventories, respectively marked C and D, (forming part of the protocol,) which are forwarded with this report, will show in part the action of the governor in the premises. For the rest he gave a certificate stating the interest of each occupant in the premises occupied, on the back of which the commissioners placed their approval, and it was left to be delivered to the occupant.

"In order to be accurate and prevent disputes hereafter about the title to houses and lots we made a map of New Archangel, (forwarded with this report,) on which every house and dwelling in the town is located and numbered, and as between the claimant and the United States the title defined to it and settled in the inventories. This was thought necessary in order to give, in accordance with your instructions, to each man of property who desired to dispose of it a certificate of title.

"The town of New Archangel" (now Sitka) "was built in the main by the Russian-American Company, and, except the dwellings transferred by them to their employés and the public buildings transferred to the United States, is owned by that company still.; yet it has but a possessory interest in the land, as it only had permission to erect buildings upon it; for although it had authority to vest the title of lands in its employés it had no power to vest such title in itself. The commissioners *left the matter as they found it* and the company in possession of its buildings.

" All the buildings in anywise used for public purposes were delivered to the United States commissioner, taken possession of, and turned over to General Davis, as were also the public archives of the territory, and in a spirit of liberality the wharf and several valuable warehouses belonging to the Russian-American Company were included in the transfer by the Russian commissioner. Both the wharf and the warehouses were very much needed by our people."

In a joint report of the commissioners, termed a protocol, it was stated that there had been delivered to General Rousseau " the forts and public buildings, including the governor's house, dock-yards, block-houses, barracks, batteries, hospitals, wharves, and schools in the town of New Archangel, an inventory of which, marked ' A,' was attached. We gave certificates of ownership to the individual owners of private houses and of lots in fee simple in the town of New Archangel, as directed, a list of whose names is presented in inventory marked C, attached to and made part hereof. In inventory marked D, attached to and made part hereof, are shown the houses and buildings owned by private individuals in New Archangel, the owners thereof having no title in fee to the lands on which they are situated."

The Court of Claims found that " the property in dispute in this suit is not included in inventory C, where are found the names of owners to whom the commissioners gave certificates of title, but, in inventory D, which is a list of buildings the owners of which have no title in fee to the land on which they are situated." No owner of this building was named.

The court further found that after the transfer " William S. Dodge was appointed collector of customs at Sitka, and in June or July, 1868, he was in possession and occupancy of the northern part of the building described in the claimants' petition, which he used as a custom's warehouse. At the same time and afterwards the claimant Sussman was in the occupancy of another part of the building." This occupancy was continued by Dodge and his successors in the office of collector of customs.

In 1869, it having been reported to the War Department

that a very large part of the property which belonged to the Russian Fur Company was enjoyed by persons claiming title by purchase from that company after the cession of the territory, the Secretary of War directed the military commander of the Department of Alaska to take possession of and retain in his charge all posts, buildings, etc., which were not in fact entitled to be considered individual property. In pursuance of this order, the commanding general took possession of the entire building in question, which has since been claimed and occupied by the government.

Claimant Kinkead protested against this seizure, claiming that the building had been designated as private property; that it had been purchased of the Russian-American Company, and that the title acquired was good, valid, and legal.

It further appeared that in December, 1868, Mr. Ketchum, then collector of customs, assumed to lease from Sussman, as agent for Louis Sloss, to whom the Russian Company had given a deed, part of the warehouse in question at a monthly rental of two hundred dollars. This lease, however, was promptly disapproved by the Secretary of the Treasury, who advised him that no building could be hired by him for any purpose without the previous assent of the department.

It appeared that the territory of Alaska had, prior to its cession to the United States, been occupied by a Russian corporation known as the Russian-American Company, a corporation largely engaged in fur trading. This company had the privilege of making use of the public lands and erecting buildings thereon. It had no right, however, of becoming the owner of such lands, but did have the privilege of conveying parcels of it in fee simple to its employés. Pursuant to this privilege, it had made conveyance of certain of these lands to its employés, upon which had been constructed the dwellings erected by the company and occupied by such employés, their widows or children. Apparently, however, it had no right to acquire for itself any title to the soil, and enjoyed nothing more than the use of the land upon which its buildings were situated, the dominion or right of property therein remaining in the Russian government. The company appears to have

possessed not only the ordinary powers of a trading corporation, but certain governmental powers, which it exercised arbitrarily, if not despotically, over the entire territory. It had a monopoly of the trade of the territory, and appears to have been in fact a provincial government of the Russian Empire.

As no question is made but that the land upon which this building is situated belonged to the Russian government, and that the building was erected in 1845 by permission of the Emperor, for the use of this company in the storage and sale of its furs and for other trading purposes, and was so constructed of heavy hewn logs as to be incapable of removal, no good reason is apparent for excepting it from the ordinary rule which attaches such buildings to the realty. The presumption is that buildings belong to the owner of the land on which they stand as a part of the realty. *Quicquid plantatur solo, solo cedit.* "If one erects a permanent building, like a dwelling-house, upon the land of another voluntarily and without any contract with the owner, it becomes a part of the realty, and belongs to the owner of the soil." *Madigan* v. *McCarthy*, 108 Mass. 376 ; Taylor on Land. & Ten., § 544.

It is true there is abundant authority for holding that buildings may by agreement of parties be erected upon land without becoming affixed thereto, and that neither the mode of annexation nor the use thereof is conclusive as to the intention of the parties, although the presumption is that the building so erected becomes a part of the freehold. *Wood* v. *Hewett*, 8 Q. B. 913 ; *Crippen* v. *Morrison*, 13 Michigan, 23 ; *Mott* v. *Palmer*, 1 N. Y. 564 ; *Sudbury* v. *Jones*, 8 Cush. 184 ; *Howard* v. *Fessenden*, 14 Allen, 124.

The extrinsic evidence, however, in this case, so far from showing an intention on the part of the Russian government that this building should not pass under the treaty, evinces a determination on the part of both governments that it should so pass. Not only did the land belong to the Russian government, but the building was of a size and construction such as to render it practically impossible of removal. The correspondence between the Secretary of State and the Russian

minister with reference to the sixth article contemplates that there were "*reservations*" and "*possessions*" owned by *associated companies*, Russian or other, which were to pass under the treaty, and the sum of two hundred thousand dollars was added to the consideration money to cover the cession of such properties. More explicit words than those used in article six to distinguish between the property of associated companies, "corporate or incorporate, Russian or any other," and merely "private individual property holders," could scarcely be chosen to express the determination of both countries that the cession should be free and unencumbered by any reservations, privileges, franchises, grants, or possessions of incorporated companies. The private property of individual holders was evidently exempted from the cession for the reason that while the Russian-American Company could not acquire title to the real estate occupied by itself, it could confer such title upon those of its employés who desired to make homes for themselves in that territory. There can be no good reason to doubt that it was intended by this designation of private individual property to include as within the cession not only all real property belonging to the government; but all buildings erected by its permission upon such property, except such as belonged to individuals. Whether the Russian government had the right to make this disposition of the property of the Russian-American Company involves questions of Russian law which we are not compelled to pass upon. It is enough that the Emperor assumed to deal in this way with the property of his subjects. Inasmuch, however, as two hundred thousand dollars were added to the price originally agreed upon, in consideration of the cession of the property of associated companies specified under the sixth article, and as the Russian-American Company appears to have been the only corporation existing in the territory to which the terms of this cession could apply, we may safely assume that this amount was intended to compensate it for its interest in the buildings erected by it. Its charter had already expired in 1862, and had not been renewed at the time of the cession. Its franchises had, therefore, been extinguished, and it can hardly be

assumed that the letter of Mr. Seward was intended to be confined to such franchises.

It may be remarked in this connection that there is a manifest inconsistency in the positions assumed by the petitioners. Their only right in this building is derived from a deed of the land which confessedly belonged to the Russian government. Yet the whole theory of the petitioners' case rests upon the assumption that the building was erected under such circumstances that it was not intended to become a part of the freehold. Consistency then would seem to require that the deed should be of the building alone, whereas it is, in fact, a deed of the land, and can only pass the building upon the theory that the building was affixed to the land, a theory quite inconsistent with the petitioners' contention. If the building were so constructed as to be removable, there would be some reason for saying that it was not contemplated that it should become a fixture, but the difficulty with petitioners' claim is that they cannot assert title to the building without also asserting title to the land.

It is insisted, however, that the contemporaneous construction of the treaty by those who were authorized to carry it into effect was such as to indicate that the property of the Russian-American Company was not intended to pass. The instructions of the government to General Rousseau were that " the transfer will include the forts and military posts and public buildings, etc., all public lands and all ungranted lots of land, etc., while private dwellings and warehouses are subject to the control of their owners and are not included in the transfer. . . . In order, however, that the said individual proprietors may retain their property as aforesaid," he was authorized to give them a certificate of their right to hold the same. The words " private dwellings," and " individual proprietors " used in these instructions should be construed in connection with the treaty, which reserved only " private individual property." Obviously it was beyond the power, even of the Russian government itself, without a gross violation of the treaty, to enlarge the exception of private individual property so as to include all private property, whether owned by cor-

porations or individuals. In his report of his proceedings, General Rousseau stated that the town was built mainly by the Russian-American Company, and, "except the dwellings transferred by them to their employés and the public buildings transferred to the United States, is owned by that company still;" that "although it had authority to invest the title to land in its employés, it had no authority to invest such title in itself;" that "all the buildings in anywise used for public purposes were delivered to the United States commissioner, . . . and in a spirit of liberality the wharf and several valuable warehouses belonging to the Russian-American Company were included in the transfer." Whether this was one of the warehouses included in the transfer does not clearly appear, though it was contained in inventory D, which showed the houses and buildings owned by private individuals, the owners having no title to the fee in the land. It is quite clear, however, that it was never intended to invest the commissioners with judicial power to determine the title to property in Sitka; or to pass finally upon the question whether a particular building passed under the treaty or not. If, for instance, the commissioners had inventoried a certain house as the property of A, when in fact it was the property of B, no one would seriously claim that such act would transfer the property from B to A. Or, if they had assumed to list the property of an individual land owner as the property of the government or the Russian-American Company, that it would in any manner change the title to such property, or estop the real owner to assert his title thereto in a court of justice. So, if they assumed to list the property of the Russian-American Company as "private individual property" within the language of the treaty, it certainly would not operate to vest a good title in any one who might see fit to purchase such property from the Russian-American Company, even if he purchased upon the faith or such inventory, as Sloss appears to have done in this case. The truth is, the powers of the commissioners were simply ministerial, and the making of inventories simply a matter of convenience, and a method of determining *prima. facie* what property the government should appropriate to

itself for the time being, and what should be left to the individual proprietors.  To treat this inventory as binding either upon the government or individuals would be to acknowledge that the commissioners were invested with judicial powers to determine the title to property.  Clearly they had no power to depart from the plain language of the treaty, and no power to bind the government by an assumption that government property was private property, and thus settle questions of title or ownership.  The weight that has been given to contemporaneous construction has never gone to the extent of holding that the title or ownership of property may be changed by the action of executive officers appointed to carry a statute or treaty into effect.

The case of *Comegys* v. *Vasse*, 1 Pet. 193, relied upon by the petitioners, is readily distinguishable from the case under consideration.  In the treaty with Spain for the cession of Florida, the United States undertook to make satisfaction of certain claims of Spanish subjects, and by article 11, to ascertain the full amount and validity of those claims, a commission, to consist of three commissioners, was to be appointed " to receive, *examine, and decide* upon the amount and validity of all claims," etc.  Such commissioners were to act under oath for the faithful discharge of their duties, and were authorized to hear and examine witnesses upon oath, and to receive all suitable testimony.  In other words, they were invested with judicial power to pass upon these claims, and their decision, within the scope of this authority, was held to be conclusive and final.  Said Mr. Justice Story, (page 212): " The parties must abide by it as the decree of a competent tribunal of exclusive jurisdiction." But even in this case it was held that their authority did not extend to the adjustment of all conflicting rights of different citizens to the fund so awarded.  The rights of the several claimants to the fund were left to the ordinary course of judicial proceedings in the established courts of justice.  The powers of the commissioners in this case were evidently of a very different character from those delegated to General Rousseau.

It is further contended that the Court of Claims was es-

topped to consider the question of title by the recitals in the act of Congress of January 17, 1887, 24 Stat. 358, c. 21, referring this claim to that court, in which the building in question is recognized as having been the property of the Russian-American Company. The act recites that "Whereas John H. Kinkead, of Nevada, and Samuel Sussman, of California, did . . . purchase a certain building situated, etc., . . . from the Russian-American Company, *the owner of said building*; and

"Whereas said building had been declared by the protocol of the transfer of Russian America to the United States to be private property; and

"Whereas thereafter the collector of customs of the United States did take from said Kinkead and Sussman a lease of a portion of said building, and entered thereupon; and

"Whereas afterwards General Jefferson C. Davis did seize the whole of said building, on the ground that the same was the property of the United States, notwithstanding the commissioner appointed to ascertain private property had certified the same to be private property: . . .

"Therefore be it enacted, . . . that jurisdiction be, and is hereby, conferred on the Court of Claims to hear the claims, etc., . . . for the rent and value of certain buildings . . . alleged by them to have been acquired by virtue of purchase from the Russian-American Company, upon the evidence already filed in said court, and such additional legal evidence as may be hereafter presented on either side; and if said court shall find that said parties acquired a valid title to said buildings respectively alleged to have been purchased by them, said court shall award said parties a fair and reasonable rent," etc.

In other words, the Court of Claims is required to find, first, whether the petitioners acquired a valid title; second, what shall be deemed a fair and reasonable rent; third, a suitable indemnity for the buildings themselves. Now, as the question whether the petitioners had a valid title to these buildings depended, not upon the fact of purchase from the Russian-American Company, which was admitted in the first recital of

the statute and never denied by any one, but upon the title of the Russian-American Company, and its right to convey, which had been called in question by the refusal of the Secretary of the Treasury to allow the petitioners' claim for rent, it is impossible that Congress could have intended by the recital to estop the Court of Claims from passing upon the very question referred to it for judicial determination. Petitioners assert that the whole object of the act was to permit the Court of Claims to pass upon the reasonableness of the rent and the value of the building. This theory, however, is not only wholly inconsistent with the enacting words, but with the position assumed by the officers of the government prior to the enactment in question. Indeed, there had been no dispute between the parties as to the amount of the rent; but there had been a seizure of the property by a military officer of the United States under express directions of the Secretary of War, and a total repudiation by the Secretary of the Treasury of the act of Ketchum, collector of customs, in assuming to lease this building, and a denial of any claim for rent. In the face of these proceedings it is wholly improbable that Congress should have admitted the ownership of the Russian-American Company, which was the question upon which the liability of the government wholly depended. Petitioners insist that the Court of Claims should have accepted the preamble as a correct recital of the fact, and should have determined, first, whether the petitioners had acquired the building in controversy by virtue of purchase from the Russian-American Company; and, second, whether the petitioners had acquired a valid title to said building. The fact that Kinkead and Sussman had purchased the building was as distinctly set forth in the first recital as that the Russian-American Company was the owner, and if it were unnecessary for it to determine one question it was equally so to determine the other.

It is well settled, however, that a mere recital in an act, whether of fact or of law, is not conclusive unless it be clear that the legislature intended that the recital should be accepted as a fact in the case. Endlich on Statutes, § 375. It was

stated by the court in *Branson* v. *Wirth*, 17 Wall. 32, 44, that
" whilst the recital of public acts are regarded as evidence of
the facts recited, it is otherwise, as we have seen, with refer-
ence to private acts. They are not evidence except against
the parties who procure them."

We are referred, however, to the case of the *United States*
v. *Jordan*, 113 U. S. 418, as sustaining a contrary doctrine.
In this case an act of Congress provided " that the Secretary
of the Treasury be, and he is hereby, authorized and directed
to remit, refund, and pay back, out of any moneys in the
Treasury not otherwise appropriated, to the following-named
citizens of Tennessee: . . . the amount of taxes assessed
upon and collected from the said named persons, contrary to
the provisions of the regulations issued by the Secretary of
the Treasury," etc. Jordan was one of the parties named in
the act. The Secretary of the Treasury having construed the
act to mean only that such sums should be refunded as were
collected from the persons named *contrary to the provisions of
the regulations* issued by the Secretary of the Treasury, this
court held that the statute did not admit of that interpretation,
nor leave open any question for the court or for the account-
ing officers of the Treasury, except the identity of the claim-
ants with the persons named in it. "Although the act," said
Mr. Justice Blatchford, "speaks of the sums as being 'the
amount of taxes assessed upon and collected from the said
named persons, contrary to the provisions of the regulations'
named, there is no indication of any intention to submit to
any one the determination of the question whether the taxes
in any case were collected contrary to the provisions of such
regulations, or of the question how those provisions are to be
construed."

It needs no argument to show that there is a wide distinc-
tion between an act directing a particular thing to be done,
and an act reciting the existence of a certain fact which had
long been a matter of dispute, and which the Court of Claims
was authorized by the act to pass upon and determine.

Counsel have also seen fit to lay before us the report of a
Senate committee accompanying the bill, which afterwards

became the act of January 17, 1887, which report was in favor of the justice of the claim. In accordance with this report the committee submitted a bill conferring jurisdiction upon the Court of Claims to hear this claim upon the evidence already filed and such additional legal evidence as might be presented, and directing said court to award a fair and reasonable rent, etc. The bill, however, was amended upon the floor of the Senate by inserting the words, " if said court shall find that said parties acquired a valid title to said buildings respectively alleged to have been purchased by them," thus evincing a clear intention on the part of the Senate to require the petitioners to satisfy the court of the validity of their title to the building. We think it clear there is nothing in the recital of the act which even throws a doubt upon the intention of Congress to require the court to be satisfied of this fact.

The truth is that the whole case of the claimants depends upon the question whether the government was bound by the proceedings of the commissioners in the execution of the treaty. As we have already expressed the opinion that they possessed no power to vary the language of the treaty or to determine questions of title or ownership, it results that their action was not binding upon the government.

The judgment of the court below is, therefore,

*Affirmed.*

MR. JUSTICE SHIRAS, with whom concurred MR. JUSTICE FIELD, dissenting.

In the case of the *United States* v. *Percheman*, 7 Pet. 51, 86, Chief Justice Marshall said :

" It may not be unworthy of remark that it is very unusual, even in cases of conquest, for the conqueror to do more than to displace the sovereign and assume dominion over the country. The modern usage of nations, which has become law, would be violated ; that sense of justice and of right which is acknowledged and felt by the whole civilized world would be outraged, if private property should be generally confiscated

and private rights annulled. The people change their allegiance; their relation to their ancient sovereign is dissolved; but their relations to each other and their rights of property remain undisturbed. If this be the modern rule, even in cases of conquest, who can doubt its application to the case of an amicable cession of territory?"

Upon this view of the subject it might be justly expected that when, in 1867, a treaty for the cession of the dominions of Russia in America was concluded between the United States and the Emperor of Russia, the rights of private property would remain undisturbed. Nor would that just expectation be disappointed; for, on reading the treaty, we find explicit provisions, preserving and excluding from the operation of the cession private property. It, however, appears that portions of the ceded territory had been occupied by an association or company known as the Russian-American Company, and which seems to have claimed and exercised an almost despotic control over the sparse population, whether native or Russian, and also to have been possessed, by grant from the Russian government, of certain franchises and privileges, the precise nature and extent of which are not disclosed. Aware of the existence of this company, and apparently fearful lest troublesome contentions as to such special privileges and franchises might afterwards arise, the government of the United States insisted on the insertion in the treaty of an explicit article, providing that the cession of territory and dominion should be declared to be free and unincumbered by any reservations, privileges, franchises, grants, or possessions by any associated companies, whether corporate or incorporate, Russian or any other, or by any parties except merely private individual property holders.

The fourth article of the treaty provided that the Emperor of Russia should appoint an agent or agents for the purpose of formally delivering to a similar agent or agents, appointed on behalf of the United States, the territory, dominion, property, dependencies, and appurtenances which were ceded, and for doing any other act which might be necessary in regard thereto.

Subsequently, and in pursuance of the fourth article of the treaty, the Russian government appointed Alexis Pestchouröff, and the United States appointed General Lovell H. Rousseau, as their respective commissioners, and these commissioners proceeded to fulfil the duties of their appointment under instructions from their respective governments. The instructions from the government of the United States were as follows :

"Pursuant to the stipulations of the treaty, that transfer will include all forts and military posts and public buildings, such as the governor's house and those used for governmental purposes, dock-yards, barracks, hospitals, and schools; all public lands, and all ungranted lots of land at Sitka and Kodiak. Private dwellings and warehouses, blacksmiths', joiners', coopers', tanners', and other similar shops, ice-houses, flour and saw-mills, and any small barracks on the islands, are subject to the control of their owners, and are not to be included in the transfer to the United States."

The instructions to Captain Pestchouroff from the Russian government were as follows:

"3. All the forts and military posts will be delivered at once to the American military forces that may follow the United States commissioner. . . .

"4. The public buildings, such as the governor's house, the buildings used for government purposes, dock-yards, barracks, hospitals, schools, public grounds, and all free lots at Sitka and Kodiak, will be delivered by Captain Pestchouroff to the American commissioner as soon as practicable.

"5. All the houses and stores forming private property will remain to be disposed of by their proprietors. To this same category belong smiths', joiners', coopers', tanners', and other similar shops, as well as ice-houses, saw and flour mills, and any small barracks that may exist on the islands. . . ." (H. R. Ex. Doc. No. 177, 40th Cong. 2d Sess. p. 19.)

The commissioners proceeded to fulfil the duties imposed upon them, and on October 26, 1867, signed a protocol or statement of their action. It thereby appears that there was delivered to General Rousseau, for the United States, the government archives, papers, and documents relating to the terri-

tory and dominion therein named; also the forts and public buildings, including the governor's house, dock-yards, block-houses, barracks, batteries, hospital, wharves, and schools in the town of New Archangel, an inventory whereof, marked "A," was attached to the protocol. It further appears that an inventory, marked "B," was attached, describing the church buildings, etc., left in the hands of the Greco-Russian Church; and that an inventory, marked "C," was attached, giving a list of certain lots and houses held in fee simple by persons named; and an inventory, marked "D," was likewise attached, showing the houses and buildings owned by private individuals in New Archangel, the owners thereof having no title in fee to the land on which the buildings were situated.

*The building in question in this case was specified in inventory " D " as private property.*

Subsequently, on October 28, 1868, the Russian-American Company, by Prince Maksoutoff, its chief administrator, (who had assisted the Russian commissioner in making the delivery and inventory of the property under the treaty,) sold and conveyed the property in question to Louis Sloss, describing it as " that piece or parcel of land situate near and adjoining to the public wharf of said city, upon which is erected building No. 1, and described as a warehouse in the map and inventory ' D,' attached to and made a part of the protocol of the transfer of said territory to the United States by Russia, and therein declared to be private property." The title of Louis Sloss, by deed of October 28, 1868, was declared to have been taken and held by him for and on account of John H. Kinkead and Samuel Sussman.

After the transfer, William S. Dodge was appointed collector of customs at Sitka, and in June or July, 1868, he was in the possession and occupancy of the northern part of the building described in the claimants' petition, which he used as a customs warehouse. At the same time and afterwards the claimant Sussman was in the occupancy of another part of the building. Dodge continued so to occupy the northern part of the building until about the 1st of December, 1868, when he turned it over to Hiram Ketchum, Jr., his successor in the office of collector,

who continued in the same occupancy till March 4, 1869, when he resigned the office and turned the warehouse over to Samuel Falconer, the deputy collector of the port.

Before and after the last named date, General Jefferson C. Davis, United States Army, was at Sitka in command of the department of Alaska.

On the 26th of February, 1869, there was sent to him from the War Department the following order:

"It having been reported to this department that a very large portion of the property which belonged to the Russian Fur Company in Alaska is now enjoyed by persons claiming title under a purchase from Prince Maksoutoff since the cession of that territory to the United States, the Secretary of War directs that you take possession of and retain in your charge all posts, buildings, etc., which are not in fact entitled to be considered individual property."

In pursuance of this order, General Davis, on the 2d of June, 1869, authorized Falconer to take possession of and use the whole building for government purposes pertaining to the Treasury Department, except the three lower rooms of it situated on the southeast side of the lower passageway, which rooms were reserved by General Davis for the storage of army stores, and were, in the month of September following, placed under the control of the quartermaster's department of the army.

From that time to the present the whole building has remained in the possession and use of the government, Falconer continuing in the occupancy of the part of it so assigned to him until August, 1869, when he turned it over to William Kapus, who had been appointed collector of the port.

On June 2, 1869, the claimants protested in writing to General Davis against his action in taking possession of said building, alleging that the building had been designated as private property by the commissioners appointed by the governments of Russia and the United States; that it had been purchased of Prince Maksoutoff, chief factor of the Russian-American Company; and that the title acquired through that purchase was good, valid, and legal.

Failing to get redress from the agents and officers of the United States, Kinkead and Sussman brought an action in the Court of Claims for use and occupation of the premises, which suit was by that court dismissed for a supposed want of jurisdiction. *Kinkead* v. *United States*, 18 C. Cls. 504.

Thereafter Congress passed the following act: (act of January 17, 1887, 24 Stat. 358, c. 21.)

"An act referring to the Court of Claims for adjudication the claims of John H. Kinkead, Samuel Sussman, and Charles O. Wood.

"Whereas John H. Kinkead, of Nevada, and Samuel Sussman, of California, did, on the twenty-eighth day of October, eighteen hundred and sixty-eight, purchase a certain building situate on lot known as number one on the official plat of the town of Sitka, in the Territory of Alaska, from the Russian-American Company, the owner of said building; and

"Whereas said building had been declared by the protocol of the transfer of Russian America to the United States to be private property; and

"Whereas thereafter the collector of customs of the United States did take from said Kinkead and Sussman a lease of a portion of said building and entered thereupon; and

"Whereas afterward General Jefferson C. Davis did seize the whole of said building, on the ground that the same was the property of the United States, notwithstanding the commissioners appointed to ascertain private property had certified the same to be private property; and

"Whereas afterward said Kinkead and Sussman did present their petition to the United States Court of Claims claiming rent for the said building; and

"Whereas said court did, on the eleventh day of June, eighteen hundred and eighty-three, dismiss said claim for want of jurisdiction only; and

"Whereas Charles O. Wood, of Ohio, did in like manner purchase a certain other building situate on lot known as number twenty-four from said Russian-American Company,

and did in like manner present his petition to the Court of Claims for rent of the same, the same having been in like manner seized for the use of the United States. notwithstanding the same had been certified to be private property ; and

" Whereas said Court of Claims did in like manner dismiss the claim of said Wood for want of jurisdiction only : Therefore

" *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That jurisdiction be, and is hereby, conferred on the Court of Claims to hear the claims of John H. Kinkead and Samuel Sussman and Charles O. Wood for the rent and value of certain buildings in the town of Sitka, in the Territory of Alaska, alleged by them to have been acquired by virtue of purchase from the Russian-American Company, upon the evidence already filed in said court and such additional legal evidence as may be hereafter presented on either side ; and if said court shall find that said parties acquired a valid title to said buildings respectively alleged to have been purchased by them, said court shall award to said parties a fair and reasonable rent for the use of the said buildings for the time (if any) the same have been occupied by the United States, and also a suitable indemnity for said buildings themselves, and the receipt of such rent and indemnity shall thereafter bar any further claim by said parties for the use of said buildings or for the value thereof ; and before receiving the same all of said parties shall execute a release to the United States for all right, title and interest whatsoever in and to the said property, and any defence, set-off, or counter-claim may be pleaded by the United States as defendants as in cases within the general jurisdiction of the court, and either party shall have the same right of appeal as in such cases.

" Approved January 17, 1887."

The claimants thereupon filed in the Court of Claims their petition claiming, under the terms of the special act, " a fair and reasonable rent for the use of said buildings for the time,

if any, the same had been occupied by the United States, and also a suitable indemnity for the buildings themselves."

That court, on May 13, 1889, decreed that the claimants' petition should be dismissed, and from that judgment the appeal before us was brought.

It was contended, in the court below, on behalf of the claimants, that, under the terms of the act, it was not open for the court to determine whether the claimants were precluded by the treaty from maintaining their claim, but that, as the act, in its recitals, declared that the Russian-American Company was the owner of said building, the court's inquiry was restricted to finding whether the claimants had acquired a valid title to the buildings alleged to have been purchased by them, and to fixing a fair and reasonable rent for the time the same had been occupied by the United States, and also a suitable indemnity for the buildings themselves; and it was also contended that, even if the act of Congress allowed the Court of Claims to inquire into the meaning and effect of the treaty, yet that the claimants were, taking into view the treaty, the protocol and the act of Congress, entitled to recover.

The Court of Claims decided both contentions against the claimants. It held that, notwithstanding the terms of the act, the court had a right to interpret the terms of the treaty, and having found, as it did, that, under the terms of the treaty, the building in question had become the property of the United States, it further held that there was nothing in the acts of the commissioners characterizing the building as private property, or in the act of Congress, referring the matter to this court, which created or conferred any right or title in the building to the claimants.

To sustain their contention that the act of Congress, referring their claim to the Court of Claims, did not leave any question for the court as to the meaning and effect of the treaty, the claimants cite the case of *United States* v. *Jordan,* 113 U. S. 418, 422. There an act of Congress provided for the refunding to persons named therein of the amount of taxes assessed upon and collected from them contrary to the provis-

ions of the regulations therein mentioned, and it was held that there was no discretion vested in the Court of Claims to determine whether the sum awarded to the suitor was or was not the amount of a tax assessed contrary to the provisions of such regulations. This court said, through Mr. Justice Blatchford, " the Court of Claims held that the statute did not . . . leave open any question for the court, . . . except the identity of the claimants with the persons named in it; and that its language, taken together, was too clear to admit of doubt that Congress undertook, as it had a right to do, to determine not only what particular citizens of Tennessee by name should have relief, but also the exact amount which should be paid to each one of them. We concur in this view. . . . Although the act speaks of the sums as being ' the amount of taxes assessed upon and collected from the said named persons contrary to the provisions of the regulations,' named, there is no indication of any intention to submit to any one the determination of the question whether the taxes in any case were collected contrary to the provisions of such regulations, or of the question how those provisions are to be construed. On the contrary, the clear import of the statute is that Congress itself determines that the amounts named were collected contrary to the provisions of the regulations."

Claimants likewise cite the case of *Dahlgren* v. *United States*, 16 C. Cl. 30, 50, where the Court of Claims, through Judge J. C. B. Davis, construing an act of Congress which had referred a claim to that court, said that " where the government has a special defence to a claim, and the facts constituting the defence are well known to Congress, it is unreasonable to suppose that Congress would refer the claim to this court with the intent that the special defence should be set up and the claim defeated thereby."

It is to be observed that in the case of the act which was the subject of construction in *United States* v. *Jordan*, the decisive language was in the enacting part of the statute, whereas in the statute now before us it is in the preamble. Still, it must be conceded that the language relied upon, although in the preamble, is in absolute and not in conditional terms. The

Russian-American Company is spoken of as "the owner of said building." The only uncertainty or contingency appears in the language of the enacting clause, wherein it is provided that "if the court shall find that said parties acquired a valid title to said building *alleged to have been purchased by them*, the court shall award," etc. It was further contended on behalf of the complainants that the action of the international commissioners, in distinguishing between public property which should pass to the United States and private property which should not be disturbed, is to be regarded as an act of a diplomatic and political character, and which it was not competent for Congress to refer to the Court of Claims for review or reëxamination. To sustain the proposition that the decisions of international commissions, rendered within the scope of their authority, are final and exclusive, a number of authorities are cited in the brief for the appellants, among others the leading case of *Comegys* v. *Vasse*, 1 Pet. 193, 212. That case arose out of the treaty whereby Spain ceded Florida to the United States, and wherein commissioners were invested with power and authority to receive, examine, and decide upon the amount and validity of asserted claims upon Spain for damages and injuries. This court held, per Story, J., that the decision of the commissioners within the scope of their authority was final and conclusive; that the parties must abide by it as the decree of a competent tribunal of exclusive jurisdiction. The court held, likewise, that though the finding of the amount and right to receive was final, yet the jurisdiction of the commissioners did not extend to determining any disputes that might arise as to the subsequent ownership of such claims. "The validity and amount of the claim being once ascertained by their award, the fund might well be permitted to pass into the hands of any claimant; and his own rights, as well as those of all others who asserted a title to the fund, be left to the ordinary course of judicial proceedings in the established courts, where redress could be administered according to the nature and extent of the rights or equities of all the parties."

Applying the reasoning of that and of kindred cases to the

present, it is argued that the finding of the commissioners of Russia and the United States was final as to the status of the properties passed upon by them as public or private, that being the purpose for which they were appointed; that it was competent for Congress to refer the dispute that subsequently arose between the United States and the claimants to the Court of Claims; but that the court, in passing upon the case, could not go back of the action of the commissioners, and retry the question under what category, public or private, the property in question was to be regarded.

The court below did not accept the claimants' propositions, but held that it was open to it, under the terms of the act referring the claim to it, to disregard the preamble of the act itself, to go back of the action of the international commissioners, and to decide for itself the meaning and effect of the treaty.

These rulings of the court cannot, in my opinion, be sustained. In the first place, as it seems to me, we must get at the intention of Congress in passing the act referring the claim to the Court of Claims, by bringing into view the history of the claim. In a general way, it certainly cannot be denied that the treaty, in its terms, preserved private property rights. Nor can it be denied that the commissioners were appointed to distinguish public from private property, and to make a finding thereof. It is also ind putable that the commissioners excluded the building in dispute out of the class of public property, and included it in the class of private property. And it is admitted that Congress, having been made aware that the claimants had been turned out of the court on an alleged want of jurisdiction, removed that obstacle, and directed the court to hear the claims of Kinkead and Sussman, and if it should find that they had acquired a valid title to said building, alleged to have been purchased by them, then to award a fair and reasonable rent for its use, and a suitable indemnity for the building itself. I do not feel constrained to hold that the mere recital in the act that the Russian-American Company were the owners of the building at the time the claimants purchased it from them, of itself concludes

the court from finding otherwise. But I think that, reading the statute in the light of all the facts in the case, it is highly improbable that Congress intended to supersede the action of the international commission, and to submit the treaty to the court for its construction, and I think that the language of the preamble is entitled to be considered, in connection with the other facts of the case, to enable us to give a fair and reasonable construction to this remedial statute.

The conclusion, then, in my judgment, is, that Congress intended that the Court of Claims should inquire whether these claimants had validly derived their title from the Russian-American Company, and, if so, what was a fair rent for the use of the building, and what a suitable indemnity for the building itself.

But, in the second place, if I am wrong in this view, and if the Court of Claims had a right to go back of the language of the statute and of the action of the international commissioners, I think the court erred in their interpretation of the treaty.

In the first article the treaty provides that the Emperor of Russia should cede to the United States " all the territory and dominion now possessed by his majesty on the continent of America." The second article provides that " in the cession of territory and dominion made by the preceding article are included the right of property in all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices which are not private individual property." The view of the court below was, that by the terms " private individual property " was meant property owned by an individual as distinguished from a company or corporation, and the court thought that it was aided in this view by the provisions of the sixth article, which declared that "the cession of territory and dominion herein made is hereby declared to be free and uncumbered by any reservations, privileges, franchises, grants, or possessions by any associated companies, whether corporate or incorporate, Russian or any other, or by any parties, except merely private individual property holders."

The origin of this sixth article was in the claims and pre-

tences of the Russian-American Company, which had exercised a despotic control over these dominions, and the evident purpose of the sixth article, as is plain from the communication of Secretary Seward to the Russian Minister, was to prevent any territorial or political or corporate privileges from being subsequently asserted. It was clearly not intended to include or affect private property as such.

If this were a controversy between private parties, in a court where only municipal law is administered, like a court of common pleas, it may be that the narrow view put on this treaty by the court below might properly prevail. But when we consider that we are dealing with an international instrument, transferring territorial dominion from one sovereign to another, a broader and more liberal construction should be put on the language used. *Hauenstein* v. *Lynham*, 100 U. S. 483; *Head-Money Cases*, 112 U. S. 580. Viewed in this light, I think that the treaty meant to distinguish public property, of the various kinds enumerated, from property held by individual persons or by companies composed of individuals for private uses and purposes. Such was the view taken by the commissioners, and, as I think, by Congress, and their interpretation ought to be respected and adopted by the courts.

Even when corporations are dissolved by writs of *scire facias* or decrees in equity, at the suit of the sovereign, their moneys and property not essential to the exercise of their franchises are not forfeited, but are left to the ownership of the stockholders. In construing the treaty as a mere municipal regulation, and as an act of forfeiture, I think the court below grievously erred.

Upon the whole, I am of opinion that the judgment of the court below was erroneous, and should be reversed, and that the record should be remanded with directions to proceed, under the provisions of the act of January 17, 1887, to examine whether the claimants have lawfully derived title from the Russian-American Company, and, if so, to award them a fair rent for the use and suitable indemnity for the loss of the building owned by them.

MR. JUSTICE FIELD concurs in this dissent.