## MILLER et al. v. UNITED STATES.

### No. 11067.

Circuit Court of Appeals, Ninth Circuit.

Feb. 11, 1947.

Rehearing Denied March 18, 1947.

William L. Paul, Jr., of Juneau, Alaska, and Frederick Paul, of Seattle, Wash., for appellants.

David L. Bazelon, Asst. Atty. Gen., Roger P. Marquis and John C. Harrington, Attys., Dept. of Justice, both of Washington, D. C., and R. L. Tollefsen, of Juneau, Alaska, for appellee.

Before GARRECHT, DENMAN, and BONE, Circuit Judges.

GARRECHT, Circuit Judge.

Involving the question of whether or not the appellants have a compensable interest in certain Alaska tidelands under condemnation proceedings, this appeal requires an examination into the nature of the possessory rights of various Tlingit Indians.

On September 19, 1942, pursuant to the Second War Powers Act of March 27, 1942, 56 Stat. 177, c. 199, § 201, 50 U.S.C.A. § 171a, the appellee filed a petition for the condemnation in fee of 10.95 acres, includ-

ing land under water, for use in the establishment of wharfage facilities in connection with the Juneau Subport of Embarkation.

On April 3, 1944, the appellee filed a third amended petition in which it was alleged that the lands involved were tidelands, title to which was and always had been in the United States, and that, with a "possible exception" not pertinent here, all the improvements were the property of the United States, so that no compensation was due therefor.

In addition to certain named individuals, in the amended petition there were made parties defendant "all persons or parties unknown claiming any right, title, estate or interest in and to the real property described herein."

On July 27, 1944, the appellants filed an "answer and claim" in which some of the allegations of the appellee's petition were admitted and others were denied. Forming part of the appellants' pleading was a section captioned "affirmative defense and claim," the first paragraph of which is important:

"Ever since the year 1867, and from time immemorial prior thereto, said claimants, being Tlingit Indians of Alaska, and their predecessors and successors in lineal consanguinity, under the laws, customs and usages of the Tlingit Indians of Alaska and in conformity with the laws of the United States, during all the times herein mentioned, have been, and now are the aboriginal users and occupants of, and in the exclusive possession of, and entitled to the exclusive possession of the land, submerged land and water described as follows, namely: * * *"

The appellants further alleged that their "said use and occupancy, possession and right of possession" had "not been condemned, expropriated, extinguished, modified, impaired or encumbered by any person, corporation or body politic" until the appellee filed its first petition for condemnation "to a limited portion of said area." They claimed damages totaling $80,000.

The appellee demurred to the answer and claim on the ground that it appeared from the pleading that the appellants had no such interest in the property sought to be condemned as would entitle them to compensation. The court below filed an opinion indicating that the demurrer would be sustained because aboriginal title created no compensable interest against the United States. Later, an order was entered sustaining the demurrer. Since the appellants elected to stand on the allegations of their pleading, the court filed its final judgment, in which it was decreed that none of the appellants should receive any compensation for the taking of the lands, and that the "unencumbered and absolute title in fee simple" to the area "is vested in the United States of America, free and discharged of any and all charges, interests, claims, liens and encumbrances of any kind and character whatsoever."

From that judgment the present appeal was taken.

1. *The General Character of Indian Title.*

From the earliest reaches of American jurisprudence, the title of the Indians to the lands of their fathers has been regarded at best as one of occupancy only. In the leading case of Johnson v. McIntosh, 8 Wheat. 543, 574, 21 U.S. 543, 574, 5 L.Ed. 681, Mr. Chief Justice Marshall, referring to the aborigines, said:

"They were admitted to be the rightful occupants of the soil, with a legal as well as just claim to retain possession of it, and to use it according to their own discretion; but their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil, at their own will, to whomsoever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it. While the different nations of Europe respected the rights of the natives, as occupants, they asserted the ultimate dominion to be in themselves; and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the soil, while yet in the possession of the natives. These grants have been understood by all, to convey a title to the grantees, subject only to the Indian right of occupancy.

"The history of America, from its discovery to the present day, proves, we think, the universal recognition of these principles."

Half a century later, another Chief Justice—Waite—restated the doctrine in even more emphatic language. In United States v. Cook, 19 Wall. 591, 592, 593, 86 U.S. 591, 592, 22 L.Ed. 210, it was said:

"The right of the Indians in the land from which the logs were taken was that of occupancy alone. They had no power of alienation except to the United States. The fee was in the United States, subject only to this right of occupancy. *This is the title by which other Indians hold their lands.*" (Emphasis supplied)

And another half century later, a third Chief Justice—the one who at this writing presides over the Supreme Court—once again reaffirmed the time-honored principle. In United States v. Alcea Band of Tillamooks, 67 S.Ct. 167, 170, the following language was used:

"It has long been held that by virtue of discovery the title to lands occupied by Indian tribes vested in the sovereign. This title was deemed subject to a right of occupancy in favor of Indian tribes, because of their original and previous possession. It is with the content of this right of occupancy, this original Indian title, that we are concerned here.

"As against any but the sovereign, original Indian title was accorded the protection of complete ownership; but it was vulnerable to affirmative action by the sovereign, which possessed exclusive power to extinguish the right of occupancy at will."

See also Cherokee Nation v. Georgia, 5 Pet. 1, 17, 48, 30 U.S. 1, 17, 48, 8 L.Ed. 5; Beecher v. Wetherby, 95 U.S. 517, 525, 24 L.Ed. 440; Buttz v. Northern Pacific R., 119 U.S. 55, 66, 7 S.Ct. 100, 30 L.Ed. 330.

**2. *The Indian Right of Occupancy is "Sacred."***

■ While consistently careful to point out that the right of the red man to the lands of his ancestors was "only" that of occupancy, the Supreme Court has with corresponding uniformity insisted that this right, so far as it goes, is "sacred."

We find this transcendental adjective first used *in the concurring opinion of Mr. Justice Baldwin in Cherokee Nation v. Georgia, supra, 5 Pet. 1, at page 48, 30 U.S. 1 at page 48, 8 L.Ed. 5:*

"Indians have rights of occupancy to their lands, as sacred as the fee-simple, absolute title of the whites. * * *"

In United States v. Cook, supra, 19 Wall. 591, at page 593, 86 U.S. 591 at page 593, 22 L.Ed. 210, Mr. Chief Justice Waite went even a step farther. He held that "the right of the Indians to their occupancy" is not only as sacred as the right of private white landowners to their fee, but that it is "as sacred as that of the United States to the fee," i. e., as sacred as the fee title of the sovereign itself.

See also Mitchel v. United States, 9 Pet. 711, 746, 34 U.S. 711, 746, 9 L.Ed. 283; Minnesota v. Hitchcock, 185 U.S. 373, 389, 22 S.Ct. 650, 46 L.Ed. 954; Shoshone Tribe v. United States, 299 U.S. 476, 497, 57 S.Ct. 244, 81 L.Ed. 360; United States v. Alcea Band of Tillamooks, supra.

In Johnson v. McIntosh, supra, 8 Wheat 543, 574, 585, 588, 592, 603, 21 U.S. 543 at pages 574, 585, 588, 592, 603, 5 L.Ed. 681, Mr. Chief Justice Marshall stressed the point that, wherever the fee simple title might reside, it could be held in Indian land "subject only to the Indian right [or title] of occupancy."

Like a leitmotif, this quoted phrase runs through the Chief Justice's opinion and through subsequent decisions of the Supreme Court. European grants could "convey a title to the grantees, subject only to the Indian right of occupancy." Either the United States, or the several states, had a clear title to all the lands within the boundary lines described in the treaty [ending the Revolutionary War], "subject only to the Indian right of occupancy." The title of the crown was absolute, "subject only to the Indian right of occupancy." The absolute ultimate title has been considered as acquired by discovery, "subject only to the Indian title of occupancy." The claim of government extends to the complete ultimate title, "charged with this right of possession."

See also United States v. Cook, supra, 19 Wall. 591, 592, 593, 86 U.S. 591 at pages 592, 593, 22 L.Ed. 210; Buttz v. Northern Pacific R., supra, 119 U.S. 55 at page 67, 7 S.Ct. 100, 30 L.Ed. 330; Minnesota v. Hitchcock, supra, 185 U.S. 373 at page 389, 22 S.Ct. 650, 46 L.Ed. 954.

3. *The Indian Right of Occupancy is Compensable.*

█ It would be indulgence in pious and high-sounding but empty generalizations to say that the Indian right to occupancy is "sacred," and at the same time to refuse to grant compensation to Indian possessors when their land is taken away from them under condemnation proceedings.

The Supreme Court has countenanced no such inconsistency. In Minnesota v. Hitchcock, supra, 185 U.S. 373 at page 389, 22 S.Ct. 650, 656, 46 L.Ed. 954, the Court said:

"At the same time, the Indians' [sic] right of occupancy has always been held to be sacred; something not to be taken from him except by his consent, and then upon such consideration as should be agreed upon."

In the Tillamook case, supra, the Court, quoting with approval the foregoing language from the Hitchcock case, held that it was applicable equally to "original Indian title" and the so-called "recognized" title:

"Admitting the undoubted power of Congress to extinguish original Indian title compels no conclusion that compensation need not be paid. * * * In our opinion, taking original Indian title without compensation and without consent does not satisfy the 'high standards for fair dealing' required of the United States in controlling Indian Affairs. United States v. Santa Fe R. Co., 1941, 314 U.S. 339, 356, 62 S.Ct. 248, 86 L.Ed. 260. The Indians have more than merely a moral claim for compensation.

\*　　\*　　\*　　\*　　\*

"Furthermore, some cases speak of the unlimited power of Congress to deal with those Indian lands which are held by what petitioner would call 'recognized' title; yet it cannot be doubted that, given the consent of the United States to be sued, recovery may be had for an involuntary, uncompensated taking of 'recognized' title. We think the same rule applicable to a taking of original Indian title."

At this point, it might be well to observe that, in its brief before this court in the instant case, the appellee in two footnotes criticizes the decision of the Court of Claims in the Tillamook case, 59 F.Supp. 934. After the appellee's brief herein was filed, however, the Supreme Court affirmed the Tillamook decision of the Court of Claims.

In United States v. Klamath Indians, 304 U.S. 119, 123, 58 S.Ct. 799, 801, 82 L. Ed. 1219, the court used language that is apposite here:

"The established rule is that the taking of property by the United States in the exertion of its power of eminent domain implies a promise to pay just compensation, i. e., value at the time of the taking plus an amount sufficient to produce the full equivalent of that value paid contemporaneously with the taking."

4. *The Sources of the Appellants' Right of Occupancy.*

As we have seen, the appellants base their right of possession to the lands in question upon the claim that "ever since the year 1867, and from time immemorial prior thereto" they "and their predecessors and successors in lineal consanguinity * * * have been, and now are the aboriginal users and occupants," etc., of the land. In other words, they are claiming under "original Indian title," on which the decision in the Tillamook case, supra, rested.

█ The reference to the year 1867 is an allusion, of course, to the Treaty with Russia, proclaimed by the United States on June 20, 1867. 15 Stat. 539. An examination of that document, however, convinces us that whatever "original Indian title" the Tlingit Indians may have had under Russian rule was extinguished by the treaty.

The opening sentence of Article II of the treaty is as follows:

"In the cession of territory and dominion made by the preceding article are included the right of property in all public

lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices *which are not private individual property*." (Emphasis supplied.)

The closing sentence of Article VI reads as follows:

"The cession of territory and dominion herein made is hereby declared to be free and unencumbered by any reservations, privileges, franchises, grants, or *possessions,* by any associated companies, whether corporate or incorporate, Russian or any other, or by any parties, *except merely private individual property holders;* and the cession hereby made, conveys all the rights, franchises, and privileges now belonging to Russia in the said territory or dominion, and appurtenances thereto." (Emphasis supplied.)

There is no possibility of errors in translation here, between the official English and French versions of the Alaska treaty. The expression "private individual property" is an exact equivalent of the French "propriété privée individuelle", and the phrase "except merely private individual property holders" is the correct rendering of "sauf simplement les propriétaires possédant des biens privés individuels."

The United States Government paid an additional $200,000 for the inclusion of these reservations in the treaty. In Kinkead v. United States, 150 U.S. 483, 486, 14 S.Ct. 172, 173, 37 L.Ed. 1152, the following interesting sidelight on American history appears:

"It should be added in this connection, and as explanatory of the sixth article of the treaty, that on March 23, 1867, Mr. Seward, then secretary of state of the United States, addressed a letter to the Russian minister, in which he stated: 'I must insist upon that clause in the sixth article of the draft which declares the cession to be free and unincumbered by any reservations, privileges, franchises, grants, or possessions by any associated companies, whether corporate or incorporate, Russian or any other, etc., and must regard it as an ultimatum. With the president's approval, however, I will add two hundred thousand dollars to the consideration money on that account.' To this letter the Russian minister made reply that he be-lieved himself 'authorized to accede literally to this request on the conditions indicated', in the note of the secretary."

We agree with the appellee that "by no stretch of the imagination can [original] Indian title be considered the equivalent of private individual property."

In Cherokee Nation v. Hitchcock, 187 U.S. 294, 307, 23 S.Ct. 115, 120, 47 L.Ed. 183, the Court said:

"Whatever title the Indians have is in the tribe, and not in the individuals, although held by the tribe for the common use and equal benefit of all the members."

See also Choate v. Trapp, 224 U.S. 665, 667, 32 S.Ct. 565, 56 L.Ed. 941.

It seems quite clear, therefore, that whatever "possession" the Tlingit Indians had "from time immemorial prior to" the year 1867 was a tribal and not an individual right, and did not come within the classification of the excepted "private individual property" specified in the Russian treaty. Consequently, the Tlingits' "original Indian title" to the tidelands in question was extinguished by that state paper.

Nevertheless, the appellants are not without a right of possession in the tidelands that the appellee has sought to have condemned. This right has been repeatedly accorded the Congressional "recognition" on which the Government was vainly insisting in the Tillamook case, supra, as a sine qua non of Indian title. That insistence has been reaffirmed by the appellee in the instant case.

On May 17, 1884, there was approved "An act providing a civil government for Alaska," 23 Stat. 24. A proviso in § 8 of that act sets forth:

"*Provided,* That the Indians or other persons in said district [territory] shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress."

No such future legislation has been enacted by Congress.

On June 6, 1900, in an "Act making further provision for a civil government for

Alaska," we find that § 27 contains the following opening language:

"The Indians or persons conducting schools or missions in the district shall not be disturbed in the possession of any lands actually in their use or occupation, * * *." 31 Stat. 330, 48 U.S.C.A. § 356.

On May 1, 1936, there was enacted a statute authorizing the Secretary of the Interior "to designate as an Indian reservation any area of land which has been reserved for the use and occupancy of Indians or Eskimos by section 8 of the Act of May 17, 1884 [supra]," etc. There again we find a saving proviso:

"*Provided further,* That nothing herein contained shall affect any valid existing claim, location, or entry under the laws of the United States, whether for homestead, mineral, right-of-way, *or other purpose whatsoever,* or shall affect the rights of any such owner, claimant, locator, or entryman to the full use and enjoyment of the land so occupied." [Emphasis supplied.] 49 Stat. 1250, 1251, 48 U.S.C.A. § 358a.

On May 31, 1938—only four years before the original petition in this suit was filed —Congress enacted the following brief statute:

"That the Secretary of the Interior be, and he is hereby, authorized, in his discretion, to withdraw and permanently reserve small tracts of not to exceed six hundred and forty acres each of the public domain in Alaska for schools, hospitals, and such other purposes as may be necessary in administering the affairs of the Indians, Eskimos, and Aleuts of Alaska: Provided, *That such withdrawals shall be subject to any valid existing rights.*" [Emphasis supplied.] 52 Stat. 593, 48 U.S.C.A. § 353a.

See also § 14 of 26 Stat. 1095, 1100.

The Act of 1884 has been construed to constitute a Congressional "guarantee" to all persons in possession of lands in Alaska on the date of its enactment, that they were not to be disturbed in their occupancy. The rationale for this guarantee is lucidly expounded in Young v. Goldsteen, D.C. Alaska, 97 F. 303, 307, 308:

"The title to all these lands, mineral and nonmineral, remained in the federal government. Those making the improvements had a possessory right or title only to the premises occupied and improved by them. The mineral claimant had no greater or different right or title to the premises occupied by him than had the nonmineral claimant. This was the condition of land titles in Alaska when a form of civil government was extended to the territory in 1884. Realizing, apparently, the possibility that those who had risked so much in establishing their homes in this then well-nigh unknown country might not reap the fruits of their labor, and for the purpose of protecting them in their property rights, the congress passed the following law: [Here the court quoted the provision in the Act of 1884 that we have already set out.]

" * * * In our opinion, the language used is susceptible of but one construction; i. e. that congress *guarantied* to all persons in possession of lands in Alaska at that date the right ultimately to acquire a perfect title to the same. If anything less was intended, then the act is wholly meaningless. If congress meant only to guaranty to them undisturbed possession *for the time being,* reserving the right to ultimately pass such laws as would confiscate the property to the government, or give it to another, then the act is worse than a mockery. If the expression, 'the terms under which such persons may acquire title,' means anything, it means that at some future date the congress will pass the needful legislation whereby their possession will ripen into perfect ownership. And until such legislation is enacted the 'future legislation' is yet to be achieved." [Emphasis supplied.]

See also Haltern v. Emmons, D.C., 46 F. 452, 456, affirmed, 159 U.S. 252, 15 S.Ct. 1039, 40 L.Ed. 142; Carroll v. Price, D.C., 81 F. 137, 139, 140; United States v. Cadzow, 5 Alaska 125, 133.

From the foregoing statutes and decisions, it is clear that Congress, since 1884, has intended to protect, recognize and even "guarantee" the possessory rights of these Tlingit Indians. Such rights are compensable; for their holders are neither squatters nor outlaws.

5. *The Tlingits' Right of Occupancy Extends to the Tidelands.*

1004

The appellee insists that the fact that the area in question consists in tidelands further militates against the appellants' compensable right of occupancy therein. This Court, in the oft-quoted Heckman v. Sutter cases, 119 F. 83, 88, and 128 F. 393, 395, has held otherwise. In the first of these decisions, it was said:

"The prohibition contained in the act of 1884 against the disturbance of the use or possession of any Indian or other person of any land in Alaska claimed by them is sufficiently general and comprehensive to include tide lands as well as lands above high-water mark. Nor is it surprising that congress, in first dealing with the then sparsely settled country, was disposed to protect its few inhabitants in the possession of lands, of whatever character, by means of which they eked out their hard and precarious existence."

In his second opinion, Judge Ross elaborated the point further:

"It is true that it has never been the policy of the United States to dispose of its tide lands, but, on the contrary, that its policy has always been to retain them for the benefit of the future state in which they might lie. But it is thoroughly settled that the United States has all the power of national and municipal government over its territories, and may, if it sees fit to do so, grant rights in or titles to the tide lands of its territories as well as the public lands therein situated above high-water mark. Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L. Ed. 331, and the numerous cases there cited."

6. *The Tlingits' Right of Occupancy is Heritable and Otherwise Transmissible.*

It will be remembered that the appellants' "affirmative defense and claim" alleges that they and "their predecessors * * * in lineal consanguinity * * * during all the times herein mentioned, have been, and now are * * * in the exclusive possession of * * * the land." etc. For the purposes of the appellee's demurrer, this allegation is to be taken as true.

This court has repeatedly held that the right of occupancy and possession enjoyed by the Tlingit Indians who were on the lands in question when the act of 1884 was passed, was capable of being transmitted to their successors in interest.

In Arness v. Petersburg Packing Co., 9 Cir., 260 F. 710, 712, the following language was used:

"By the Act of May 17, 1884, c. 53, § 8, 23 Stat. 26, Congress enacted that persons in Alaska 'shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them.' That statute conferred upon persons in possession more than a mere pedis possessio. It conferred the right to convey the possessory right to another. [Cases cited]"

Again, in Worthen Lumber Mills v. Alaska Juneau Gold Mining Co., 9 Cir., 229 F. 966, 969, this Court said:

"We do not think that it was the purpose of this act [of 1884] merely to protect the possession of the Indians of lands which they then occupied in Alaska, and to deny them the power to convey to others their right of occupation. It was an act, not only for the benefit of the Indians, but also for the white settlers. It was enacted with a view to conditions which then existed in Alaska. Since the time of its acquisition, settlers and miners had been entering the territory. They had located mining claims and town sites, and had transferred lands in tracts and in lots and blocks. They had erected buildings for mercantile purposes and dwelling purposes. The mining claims and lands so occupied by Indians and settlers were held under a claim of possession only, and such possessory rights had been freely conveyed and transferred. Those possessory rights as they then existed were recognized and protected by the act. The act made no distinction between the rights of the white settlers and the rights of the Indians, and it is not to be presumed that Congress intended thereby to deprive either of the power to exercise rights which they had theretofore possessed."

One of the reasons why this court affirmed the decree of the trial judge in Whelpley v. Grosvold, 9 Cir., 249 F. 812, 815, was because it did "not appear that the appellant *or any of his predecessors in interest* was in possession of the island or claimed it in the year 1884." [Emphasis supplied.]

See also two cases, already referred to, decided by the District Court of Alaska—Haltern v. Emmons, 46 F. 452 at page 456, and Carroll v. Price, 81 F. 137 at page 140.

### 7. The Appellants Have the Right to Sue Individually.

The appellee maintains that the appellants, as individuals, "have no standing to prosecute a claim based on Indian title," but that the Indian right, if any, is tribal. Since the appellee is here referring to original Indian title, its statement may be correct, although we are not expressing an opinion on this point.

■ As we have already pointed out, however, the only sound basis for relief that the appellants have is not based upon original Indian title. The true foundation of their right is the repeated Congressional *recognition* of the occupancy or possession of the land by the "Indians" who were on the land at the time the act of 1884 was passed.

Not once in the various Congressional "recognitions" that we have referred to, does the word "tribe" occur. The occupancy or possession sought to be protected or recognized by those statutes is always that of "Indians" or "persons" or "claimants" or "the natives of Alaska"; i. e., the individual Indians or other persons who happened to be occupying the lands in 1884 and in the other years when the succeeding statutes were enacted. See Cramer v. United States, 261 U.S. 219, 227, 228, 229, 43 S.Ct. 342, 67 L.Ed. 622.

### 8. Appellants' Misconceived Legal Theory Should Not Bar Their Recovery.

■ The fact that the appellants have misconceived the basis of their right, and have pleaded what seems to be "original Indian title", should not prevent their recovery on the merits, under the record in this case.

It will be remembered that they and their "predecessors" have had "exclusive possession" "ever since the year 1867, and from time immemorial prior thereto." Since the greater includes the less, their pleading can be understood to cover adequately the period on which their true right is based; namely, possession and occupancy since the year 1884. They have simply alleged more than was necessary: the excess can be disregarded as surplusage.

Similarly, their designation of themselves as "aboriginal" users and occupants is not a fatal error. It is merely a conclusion of law, with which this court does not agree, and can be likewise dismissed as surplusage.

Section 3461 of the Compiled Laws of Alaska (1933) provides as follows:

"The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party."

In Royal Palm Soap Co. v. Seaboard Air Line R. Co., 5 Cir., 296 F. 448, 449, it was said:

"Legal conclusions expressed in the above set out plea are not to be considered in determining the legal effect of the state of facts it alleges."

See also, In re Marron Mfg. Co., 7 Cir., 1 F.2d 903; 28 U.S.C.A. § 391.

### 9. Conclusion.

It is the appellee's main contention that, "unless formally recognized or acknowledged by the ruling sovereign in such manner as to amount to a guarantee of a permanent right of occupancy, aboriginal Indian title or temporary right of occupancy may be extinguished by the United States without any liability to compensate the Indians."

As far as it relates to "aboriginal Indian title," the Supreme Court, as we have seen, already has rejected this theory. See the Tillamook case, supra. By a parity of reasoning, we believe that the same conclusion should be reached with regard to what the appellee chooses to term the Indians' "temporary right of occupancy."

As may be seen from the many Supreme Court decisions dealing with the nature of Indian title, all such title is, in a strict sense, "temporary" unless, of course, an allotment in fee simple is granted by the Government to an individual Indian. Even original Indian title is, in Mr. Chief Justice Vinson's language, "vulnerable to affirmative action by the sovereign." The Tillamook case, supra. Yet that type of Indian title is compensable.

It may freely be conceded that the so-called "temporary right of occupancy" of these appellants is similarly "vulnerable to affirmative action by the sovereign." But this second type of Indian title, we think, is likewise compensable.

Nor is it pertinent to balance the appellants' "temporary right of occupancy" in an apothecary's scales against the Tillamooks' "original Indian title"—although the repeated Congressional recognition, so much insisted upon by the appellee, might well turn the balance in the Tlingits' favor.

We are not concerned here, however, with the *quantum* of compensation, but with the *right* of compensation. We believe that the appellants have that right, and that the learned judge below erred in sustaining the demurrer against their "affirmative defense and claim."

Accordingly, the judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.