On writ of certiorari (347 U. S. 1009) to review a judgment of the United States Court of Claims holding that there is nothing in the legislation of Congress relating to Alaska which constitutes a recognition of any legal rights in the plaintiff tribe to the lands in suit. Plaintiff’s petition dismissed.
The judgment of the United States Court of Claims was affirmed by the Supreme Court February 7, 1955, in an opinion by Justice Eeed. The syllabus of the Supreme Court opinion is as follows:
The Tee-Hit-Ton Indians, an identifiable group of American Indians belonging to the Tlingit Tribe of Alaskan Indians, held not entitled to compensation under the Fifth Amendment for the taking by the United States of certain timber from Alaskan lands in and near the Tdngass National Forest allegedly belonging to the Tee-Hit-Ton Indians.
*840 1. Neither § 8 of the Organic Act for Alaska of May-17, 1884, nor § 27 of the Act of June 6,1900, providing for a civil government for Alaska, constituted a recognition by Congress of any permanent rights of Indians in Alaskan lands occupied by them: and this policy of nonrecognition was maintained and reflected by Congress in the Joint Resolution of August 8,1947, authorizing the sale of such timber without recognizing or denying the validity of any claims of possessory rights to land or timber.
2. Permissive Indian occupancy may be extinguished by Congress in its own discretion without compensation. Johnson v. McIntosh, 8 Wheat. 543; Beecher v. Wetherby, 95 U. S. 517; United States v. Santa Fe Pacific R. Co., 314 U. S. 339.
3. The recovery in United States v. Tillamooks, 329 U. S. 40, 341 U. S. 48, was based upon statutory direction to pay for the aboriginal title in the special jurisdictional act to equalize the Tillamooks with the neighboring tribes, rather than upon a holding that there had been a compensable taking under the Fifth Amendment.
4. The record does not sustain petitioners’ contention that their stage of civilization, their concept of ownership of property and their treatment by Russia take them out of the rule applicable to the Indians of the States. On the contrary, it sustains the finding that their use of their lands was like the use of the nomadic tribes of the States Indians, and there was no evidence that the Russian handling of the Indian land problem was different from ours.
5. Indian occupancy, not specifically recognized as ownership by action authorized by Congress, may be extinguished by the Government without compensation.
Mr. Justice Reed
delivered the opinion of the Court.
This case rests upon a claim under the Fifth Amendment by petitioner, an identifiable group of American Indians of between 60 and 70 individuals residing in Alaska, for compensation for a taking by the United States of certain timber from Alaskan lands allegedly belonging to the group. The area claimed is said to contain over 350,000 acres of land and 150 square miles of water. The Tee-Hit-Tons, a clan of the Tlingit Tribe, brought this suit in the Court of Claims under 28 U. S. C. § 1505. The compensation claimed does not arise from any statutory direction to pay. Payment, if it can be *841 compelled, must be based upon a constitutional right in the Indians to recover. This is not a case that is connected with any phase of the policy of the Congress, continued throughout our history, to extinguish Indian title through negotiation rather than by force, and to grant payments from the public purse to needy descendants of exploited Indians. The legislation in support of that policy has received consistent interpretation from this Court in sympathy with its compassionate purpose.
Upon petitioner’s motion, the Court of Claims under its Rule 38 (b) directed a separate trial with respect to certain specific issues of law and any related issues of fact essential to the proper adjudication of the legal issues. Only those pertinent to the nature of the petitioner’s interest, if any, in the lands are here for review. Substantial evidence, largely documentary, relevant to these legal issues was introduced by both parties before a Commissioner who thereupon made findings of fact. The Court of Claims adopted these findings and held that petitioner was an identifiable group of American Indians residing in Alaska; that its interest in the lands prior to purchase of Alaska by the United States in 1867 was “original Indian title” or “Indian right of occu-gancy.” Tee-Hit-Ton Indians v. United States, 128 Ct. 1. 82, 85, 87. It was further held that if such original Indian title survived the Treaty of 1867, 15 Stat. 539, Arts. Ill, and VI, by which Russia conveyed Alaska to the United States, such title was not sufficient basis to maintain this suit as there had been no recognition by Congress of any legal rights in petitioner to the land in question. 128 Ct. Cl. at 92. The court said that no rights inured to plaintiff by virtue of legislation by Congress. As a result of these conclusions, no answer was necessary to questions 2,5 and 6. The Tee-Hit-Ton’s petition was thereafter dismissed.
Because of general agreement as to the importance of the question of compensation for congressionally approved taking of lands occupied in Alaska under aboriginal Indian use and claim of ownership, and the conflict concerning the effect of federal legislation protecting Indian occupation between this decision of the Court of Claims, 128 Ct. Cl., at 90, and the decision of the Court of Appeals for the Ninth Circuit in Miller v. United States, 159 F. 2d 997, 1003, we granted certiorari, 347 U. S. 1009.
The Alaskan area in which petitioner claims a com-pensable interest is located near and within the exterior lines of the Tongass National Forest. By Joint Resolu *842 tion of August 8, 1947, 61 Stat. 920, the Secretary of Agriculture was authorized to contract for the sale of national forest timber located within this National Forest “notwithstanding any claim of possessory rights.” The Resolution defines “possessory rights” and provides for all receipts from the sale of timber to be maintained in a special account in the Treasury until the timber and land rights are finally determined. Section 3 (b) of the Resolution provides:
“Nothing in this resolution shall be construed as recognizing or denying the validity of any claims of posses-sory rights to lands or timber within the exterior boundaries of the! Tongass National Forest.”
The Secretary of Agriculture, on August 20, 1951, pursuant to this authority contracted for sale to a private company of all merchantable timber in the area claimed by petitioner. This is the sale of timber which petitioner alleges constitutes a compensable taking by the United States of a portion of its proprietary interest in the land.
The problem presented is the nature of the petitioner’s interest in the land, if any. Petitioner claims a “full proprietary ownership” of the land; or, in the alternative, at least a “recognized” right to unrestricted possession, occupation and use. Either ownership or recognized possession, petitioner asserts, is compensable. If it has a fee simple interest in the entire tract, it has an interest in the timber and its sale is a partial taking of its right to “possess, use and dispose of it.” United States v. General Motors, 323 U. S. 373, 378. It is petitioner’s contention that its tribal predecessors have continually claimed, occupied and used the land from time immemorial; that when Russia took Alaska, the Tlingits had a well-developed social order which included a concept of property ownership; that Russia while it possessed Alaska in no manner interfered with their claim to the land; that Congress has by subsequent acts confirmed and recognized petitioner’s right to occupy the land permanently and therefore the sale of the timber off such lands constitutes a taking fro tanto of its asserted rights in the area.
The Government denies that petitioner has any com-pensable interest. It asserts that the Tee-Hit-Tons’ property interest, if any, is merely that of the right to the use of the land at the Government’s will. That Congress has never recognized any legal interest of petitioners in the land and therefore without such rec *843 ognition no compensation is due the petitioner for any taking by the United States.
I. Recognition. — The question of recognition may be disposed of shortly. Where the Congress by treaty or other agreement has declared that thereafter Indians were to hold the lands permanently, compensation must be paid for subsequent taking. The petitioner contends that Congress has sufficiently “recognized” its posses-sory rights in the land in question so as to make its interest compensable. Petitioner points specificially to two statutes to sustain this contention. The first is § 8 of the Organic Act for Alaska of May 17,1884, 23 Stat. 24. The second is § 27 of the Act of June 6,1900, which was to provide for a civil government for Alaska, 31 Stat. 321, 330. The Court of Appeals in the Miller case, supra, felt that these Acts constituted recognition of Indian ownership. 159 F. 2d 997, 1002-1003.
We have carefully examined these statutes and the pertinent legislative history and find nothing to indicate any intention by Congress to grant to the Indians any permanent rights in the lands of Alaska occupied by them by permission of Congress. Rather, it clearly appears that what was intended was merely to retain the status quo until further congressional or judicial action was taken. There is no particular form for congressional recognition of Indian right of permanent occupancy. It may be established in a variety of ways but there must be the definite intention by congressional action or authority to accord legal rights, not merely permissive occupation. Hynes v. Grimes Packing Co., 337 U. S. 86, 101.
This policy of Congress toward the Alaska Indian lands was maintained and reflected by its expression in the Joint Resolution of 1947 under which the timber contracts were made.
II. Indian Title. — (a) The nature of aboriginal Indian interest in land and the various rights as between the Indians and the United States dependent on such interest are far from novel as concerns our Indian inhabitants. It is well settled that in all the States of the Union the tribes who inhabited the lands of the States held claim to such lands after the coming; of the white man, under what is sometimes termed original Indian title or permission from the whites to occupy. That description means mere possession not specifically recognized as ownership by Congress. After conquest they were permitted to occupy portions of territory over which they had previously exercised “sovereignty,” *844 as we use that term. This is not a property right but amounts to a right of occupancy which the sovereign § rants and protects against intrusion by third parties ut which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians.
This position of the Indian has long been rationalized by the legal theory that discovery and conquest gave the conquerors sovereignty over and ownership of the lands thus obtained. 1 Wheaton’s International Law, c. V. The great case of Johnson v. McIntosh, 8 Wheat. 543, denied the power of an Indian tribe to pass their right of occupancy to another. It confirmed the practice of two hundred years of American history “that discovery gave an exclusive right to extinguish the Indian title of occupancy, either by purchase or conquest.”
“We will not enter into the controversy, whether agriculturists, merchants, and manufacturers, have a right, on abstract principles, to expel hunters from the territory they possess, or to contract their limits. Conquest gives a title which the Courts of the conqueror cannot deny, whatever the private and speculative opinions of individuals may be, respecting the original justice of the claim which has been successfully asserted.” P. 588.
“Frequent and bloody wars, in which the whites were not always the aggressors, unavoidably ensued. European policy, numbers, and skill, prevailed. As the white population advanced, that of the Indians necessarily receded. The country in the immediate neigh-bourhood of agriculturists became unfit for them. The game fled into thicker and more unbroken forests, and the Indians followed. The soil, to which the crown originally claimed title, being no longer occupied by its ancient inhabitants, was parcelled out according to the will of the sovereign power, and taken possession of by persons who claimed immediately from the crown, or mediately, through its grantees or deputies.” Pp. 590-591. See Buttz v. Northern Pacific R. Co., 119 U. S. 55, 66; Martin v. Waddell, 16 Pet. 367, 409; Clark v. Smith, 13 Pet. 195, 201.
In Beecher v. Wetherby, 95 U. S. 517, a tract of land which Indians were then expressly permitted by the United States to occupy was granted to Wisconsin. In a controversy over timber, this Court held the Wisconsin title good.
*845 “The grantee, it is true, would take only the naked fee, and could not disturb the occupancy of the Indians: that occupancy could only be interfered with or determined by the United States. It is to be presumed that in this matter the United States would be governed by such considerations of justice as would control a Christian people in their treatment of an ignorant and dependent race. Be that as it may, the propriety or justice of their action towards the Indians with respect to their lands is a question of governmental policy, and is not a matter open to discussion in a controversy between third parties, neither of whom derives title, from the Indians. The right of the United States to dispose of the fee of lands occupied by them has always been recognized by this court from the foundation of the government.” P. 525.
In 1941 a unanimous Court wrote, concerning Indian title, the following:
“Extinguishment of Indian title based on aboriginal possession is of course a different matter. The power of Congress in that regard is supreme. The maimer, method and time of such extinguishment raise political, not justiciable, issues.” United States v. Sante Fe Pacific R. Co., 314 U. S. 339, 347.
No case in this Court has ever held that taking of T-ndian title or use by Congress required compensation. The American people have compassion for the descendants of those Indians who were deprived of their homes and hunting grounds by the drive of civilization. They seek to have the Indians share the benefits of our society as citizens of this Nation. Generous provision has been willingly made to allow tribes to recover for wrongs, as a matter of grace, not because of legal liability. 60 Stat. 1050.
(b) There is one opinion of this Court that contains language indicating unrecognized Indian title might be compensable under the Constitution when taken by the United States. United States v. Tillamooks, 329 U.S. 40.
Recovery was allowed under a jurisdictional Act of 1935, 49 Stat. 801, that permitted payments to a few specific Indian tribes for “legal and equitable claims arising under or growing out of the original Indian title” to land, because of some unratified treaties negotiated with them and other tribes. The other tribes had already been compensated. Five years later this Court *846 unanimously held that none of the former opinions in vol. 329 of the United States Reports expressed the view that recovery was grounded on a taking under the Fifth Amendment. 341 U. S. 48. Interest, payable on recovery for a taking under the Fifth Amendment, was denied.
Before the second Tillamooh case, a decision was made on Alaska Tlingit lands held by original Indian title. Miller v. United States, 159 F. 2d 997. That opinion holds such a title compensable under the Fifth Amendment on reasoning drawn from the language of this Court’s first Tillamooh case. After the Miller decision, this Court had occasion to consider the holding of that case on Indian title in Hynes v. Grimes Packing Co., 337 U. S. 86, 103, note 28. We there commented as to the first Tillamooh case: “That opinion does not hold the Indian right of occupancy compensable without specific legislative direction to make payment.” We further declared “[We] cannot express agreement with that [compensability of Indian title by the Miller case] conclusion.”
Later the Government used the Hynes v. Grimes note in the second Tillamooh case, petition for certiorari, p. 10, to support its argument that the first Tillamwoh opinion aid not decide that taking of original Indian title was compensable under the Fifth Amendment. Thereupon this Court in the second Tillamook case, 341 U. S. 48, held that the first case was not “grounded on a taking under the Fifth Amendment.” Therefore no interest was due. This later Tillamooh decision by a unanimous Court supported the Court of Claims in its view of the law in this present case. See Tee-Hit-Ton Indians v. United States, 128 Ct. Cl. 87. We think it must be concluded that the recovery in the Tillamooh case was based upon statutory direction to pay for the aboriginal title in the special jurisdictional act to equalize the Tillamooks with the neighboring tribes, rather than upon a holding that there had been a compensable taking under the Fifth Amendment. This leaves unimpaired the rule derived from Johnson v. McIntosh that the taking by the United States of unrecognized Indian title is not compensable under the Fifth Amendment.
This is true, not because an Indian or Indian tribe has no standing to sue or because the United States has not consented to be sued for the taking of original Indian title, but because Indian occupation of land without government recognition of ownership creates no rights *847 against taking or extinction by the United States protected by the Fifth Amendment or any other principle of law.
(c) What has been heretofore set out deals largely with the Indians of the Plains and east of the Mississippi. The Tee-Hit-Tons urge, however, that their stage of civilization and their concept of ownership of property takes them out of the rule applicable to the Indians of the States. They assert that Russia never took their lands in the sense that European nations seized the rest of America. The Court of Claims, however, saw no distinction between their use of the land and that of the Indians of the Eastern United States. See Tee-Hit-Ton Indians v. United States, 128 Ct. Cl. 82, 87. That court had no evidence that the Russian handling of the Indian land problem differed from ours. The natives were left the use of the great part of their vast hunting and fishing territory but what Russia wanted for its use and that of its licensees, it took. The court’s conclusion on this issue was based on strong evidence.
In considering the character of the Tee-Hit-Tons’ use of the land, the Court of Claims had before it the testimony of a single witness who was offered by plaintiff. He stated he was the chief of the Tee-Hit-Ton tribe. He qualified as an expert on the Tlingits? a group composed of numerous interconnected tribes including the Tee-Hit-Tons. His testimony showed that the Tee-Hit-Tons had become greatly reduced in numbers. Membership descends only through the female line. At the present time there are only a few women of child-bearing age and a total membership of some 65.
The witness pointed out that their claim of ownership was based on possession and use. The use that was madTe of the controverted area was for the location of winter villages in sheltered spots and in summer along fishing streams and/or bays. The ownership was not individual but tribal. As the witness stated, “Any member of the tribe may use any portion of the land that he wishes, and as long as he uses it that is his for his own enjoyment, and is not to be trespassed upon by anybody else, but the minute he stops using it then any other member of the tribe can come in and use that area.”
When the Russians first came to the Tlingit territory, the most important of the chiefs moved the people to what is now the location of the town of Wrangell. Each tribe took a portion of Wrangell harbor and the chief gave permission to the Russians to build a house on the shore.
*848 The witness learned the alleged boundaries of the Tee-Hit-Ton area from hunting and fishing with his uncle after his return from Carlisle Indian School about 1904. From the knowledge so obtained, he outlined in red on the map, which petitioner filed as an exhibit, the territory claimed by the Tee-Hit-Tons. Use by other tribal members is sketchily asserted. This is the same 350,000 acres claimed by the petition. On it he marked six places to show the Indians’ use of the land: (1) his great uncle was buried here, (2) a town, (3) his uncle’s house, (4) a town, (5) his mother’s house, (6) smokehouse. He also pointed out the uses of this tract for fishing salmon and for hunting beaver, deer and mink.
The testimony further shows that while membership in the tribe and therefore ownership in the common property descended only through the female line, the various tribes of the Tlingits allowed one another to use their lands. Before power boats, the Indians would put their shelters for hunting and fishing away from villages. With the power boats, they used them as living quarters.
In addition to this verbal testimony, exhibits were introduced by both sides as to the land use. These exhibits are secondary authorities but they bear out the general proposition that land claims among the Tlingits, and likewise of their smaller group the Tee-Hit-Tons, was wholly tribal. It was more a claim of sovereignty than of ownership. The articles presented to the Court of Claims by those who have studied and written of the tribal groups agree with the above testimony. There were scattered shelters and villages moved from place to place as game or fish became scarce. There was recognition of tribal rights to hunt and fish on certain general areas, with claims to that effect, carved on totem poles. From all that was presented, the Court of Claims concluded, and we agree, that the Tee-Hit-Tons were in a hunting and fishing stage of civilization, with shelters fitted to their environment, and claims to rights to use identified territory for these activities as well as the gathering of wild products of the earth. We think this evidence introduced by both sides confirms the Court of Claims’ conclusion that the petitioner’s use of its lands was like the use of the nomadic tribes of the States Indians.
The line of cases adjudicating Indian rights on American soil leads to the conclusion that Indian occupancy, not specifically recognized as ownership by action authorized by Congress, may be extinguished by the *849 Government without compensation. Every American schoolboy knows that the savage tribes of this continent were deprived of their ancestral ranges by force and that even when the Indians ceded millions of acres by treaty in return for blankets, food and trinkets, it was not a sale but the conquerors’ will that deprived them of their land. The duty that rests on this Nation was adequately phrased by Mr. Justice Jackson in his concurrence, Mr. Justice Black joining, in Shoshone Indians v. United States, 324 U. S., at 355, a case that differentiated “recognized” from “unrecognized” Indian title, and held the former only compensable. Id., at 339-340. His words will be found at 354-358. He ends thus:
“We agree with Mr. Justice Reed that no legal rights are today to be recognized in the Shoshones by reason of this treaty. We agree with Mr. Justice Douglas and Mr. Justice Murphy as to their moral deserts. We do not mean to leave the impression that the two have any relation to each other. The finding that the treaty creates no legal obligations does not restrict Congress from such appropriations as its judgment dictates uor.the health, education, and industrial advancement of said Indians,’ which is the position in which Congress would find itself if we found that it did create legal obligations and tried to put a value on them.” Id., at 358.
In the light of the history of Indian relations in this Nation, no other course would meet the problem of the growth of the United States except to make congressional contributions for Indian lands rather than to subject the Government to an obligation to pay the value when taken with interest to the date of payment. Our conclusion does not uphold harshness as against tenderness toward the Indians, but it leaves with Congress, where it belongs, the policy of Indian gratuities for the termination of Indian occupancy of Government-owned land rather than making compensation for its value a rigid constitutional principle.
The judgment of the Court of Claims is Affirmed.
Rehearing denied by the Supreme Court March 14, 1955.