MICHIGAN TRUST CO. *v.* GRAND RAPIDS HOTEL CO.

1. MORTGAGES—TRUST MORTGAGES — BONDHOLDERS — INCORPORATION BY REFERENCE—LONG-TERM LEASE—TITLE TO BUILDINGS AND FIXTURES.

Bondholders' interests under trust mortgage given by lessee are dependent on, and bondholders are chargeable with notice of, provisions of 99-year lease as to forfeiture and passing of title to buildings and fixtures on termination where bonds recited that they were secured by trust mortgage ''on the building situate thereon, as particularly set forth in said indenture of mortgage.''

2. SAME—TRUST MORTGAGES—PAYMENT OF GROUND RENT AND TAXES.

Trustee under mortgage of leasehold interest has right to pay ground rent and taxes required of lessee-mortgagor to preserve rights of bondholders and charge amounts so paid against lessee as mortgagor.

3. LANDLORD AND TENANT—FORFEITURE OF LEASE—DUAL CAPACITY OF LESSOR.

> Lease must be enforced according to plainly expressed terms thereof as to forfeiture and passage of title to buildings and fixtures although lessor was also stockholder and president of lessee, there being no indication but that he acted fairly.

Appeal from Kent; Brown (William B.), J. Submitted October 18, 1933. (Docket No. 89, Calendar No. 37,430.) Decided December 5, 1933.

Bill by Michigan Trust Company, as trustee for mortgage bondholders, against Grand Rapids Hotel Company and others to foreclose a trust mortgage. Bill dismissed. Affirmed.

*Travis, Merrick, Johnson & McCobb,* for plaintiff.

*Warner, Norcross & Judd,* for defendant Grand Rapids Hotel Company.

*Butterfield, Keeney & Amberg,* for defendant Keeler.

*Norris, McPherson, Harrington & Waer,* for defendant Grand Rapids Trust Company, trustee.

SHARPE, J. Prior to February 7, 1922, the Kent State Bank had purchased what was known as the old Morton Hotel property in Grand Rapids, and had obtained an option on certain real estate adjoining it on the rear, along Ionia avenue. Its purpose was to erect a new bank building thereon. A number of the prominent business men of that city, of whom Miner S. Keeler was perhaps the most active, desired to see a new first-class hotel erected on that site. The bank yielded its assent thereto,

and on February 7, 1922, an agreement was entered into between it and Mr. Keeler and a group of others interested, designated therein as "Hotel Associates," wherein Keeler agreed to acquire from the bank the land owned by it and on which it had an option to purchase, except 5,200 square feet on the corner of Ionia and Monroe avenues, on which it proposed to erect a building for its banking purposes. The price to be paid by Keeler was the sum of $260,247.62, the value of the parcel retained by the bank being fixed at $181,752.38.

Mr. Keeler and his associates, who signed their names thereto although not named therein, agreed to organize a corporation with a paid-in capital of $350,000, to be used in the construction of the hotel building, and Keeler agreed to execute to it a 99-year lease of the premises to be purchased by him. It was stipulated therein that the company, when organized, and the bank were to unite in the construction of a combined hotel and banking house thereon, to cost approximately $1,000,000; each party to pay the cost of that part of the building on its own land. The bank reserved the right to occupy the basement, first floor and mezzanine floor of its building, and agreed to lease the remainder of its building for a like period of 99 years. It was further agreed therein that the hotel company should "procure a loan upon its building" in the sum of $350,000, and that the proceeds thereof should also be used in the erection of the building.

Pursuant thereto, the Morton Building Company was incorporated on May 4, 1922, and on July 1, 1922 (although dated May 1, 1922), Mr. Keeler executed to it a 99-year lease of the land which he had theretofore purchased from the bank. In it the lessee agreed to commence the construction of a

building thereon within one year, and to complete the same within three years, the cost thereof, together with the building to be erected by the bank on the adjoining premises, to be reasonably worth the sum of $900,000, exclusive of the cost of finishing the part to be used by the bank. The lessee further agreed that in addition to its capital stock of $350,000, which should be fully subscribed and paid for, it would procure an additional sum of $350,000 by the sale of stock, "or by mortgage upon the interest of the lessee in said leasehold and building," and that the entire sum would be expended in the erection of a building upon the premises leased to it.

The lease contained a further provision:

"Any and all buildings that may be erected on said demised premises, and all improvements made, shall, at all times during the pendency of this lease, be and remain the property of the lessee, and said lessee shall have full right and authority to mortgage its right, title and interest in said premises, subject to the rights of the lessor; provided said lessee shall not be delinquent or in default in any of the obligations of said lease, on its part to be kept and performed and the lessee shall have the right, during the pendency of this lease, to make, at its own cost and expense, any alterations, additions, repairs or improvements upon the present structure, or upon said buildings to be hereafter built, it being further covenanted and agreed, by and between the parties hereto, that upon the termination of said lease at the end of the term hereinbefore provided, or in the event of the termination of said lease, at any time before such expiration of the demised term, as provided in section seventh hereof, by the breach of any of the covenants herein contained, then and in such case, any and all buildings, fixtures and improvements then situated on

said demised premises shall remain thereon and become the property of the lessor, his heirs or assigns, free from claim of any person or persons, and no compensation therefor shall be allowed or paid the said lessee, or any other person or persons."

It also contained the usual provision for forfeiture in case of default, in which event "the lessor shall have the right to reenter said premises or the buildings or improvements situated thereon, or any part thereof, either with or without process of law, and upon such reentering, take possession of the demised premises, and any and all buildings and improvements then situated thereon."

The eleventh paragraph thereof reads as follows:

"It is further covenanted and agreed and understood between the parties hereto, that time is of the essence of this agreement, and that upon the expiration of this lease, or sooner determination thereof, any and all buildings, structures, fixtures and improvements of every nature and kind, situated on said demised premises, shall be and become the property of the said lessor, and no compensation therefor shall be due or allowed or paid to the said lessee thereof, or to any other person or persons."

Pursuant to its undertaking in the lease, the Morton Building Company, on August 1, 1922, executed to The Michigan Trust Company, of Grand Rapids, as trustee, a mortgage upon "its leasehold estates and all and singular its right, title and interest in and to the lands" leased by it from Keeler and to be thereafter leased by it from the Kent State Bank, "together with all the buildings and improvements, fixtures and appliances now in process of erection, or that may be hereafter erected on the said premises," including all machinery and equipment that may be installed therein, to secure an issue of

$600,000 of six per cent. first-mortgage gold bonds. Each of the bonds contained a recital that it was "secured without preference, priority or distinction, as to lien or otherwise, of one bond over another, by a mortgage duly executed and delivered by Morton Building Company to The Michigan Trust Company, as trustee, and bearing even date herewith, the same being a first mortgage on the leasehold estates therein described, and the building situate thereon, as particularly set forth in said indenture of mortgage." In the circulars advertising these bonds for sale, of which plaintiff claims Mr. Keeler is chargeable with notice, it was stated that the bonds were secured, in opinion of counsel, by a closed first mortgage on the leasehold interests of the company and "upon the new 13-story and basement * * * Morton Hotel building now under construction."

In June, 1923, the Morton Hotel Company was incorporated for the purpose of leasing, furnishing and operating the hotel, and after the Kent State Bank had executed its lease to the Morton Building Company, pursuant to its agreement in the preliminary contract, the Morton Building Company executed to the hotel company a sublease of the entire hotel structure. These two corporations were consolidated on May 19, 1925, under the name Morton Hotel Company, and on May 20, 1925, it executed and delivered to the defendant Grand Rapids Trust Company a second mortgage upon the property described in the first mortgage to secure an issue of $200,000 seven per cent. mortgage bonds.

Under date of June 21, 1927, the Morton Hotel Company assigned all its property, assets and effects to the Grand Rapids Hotel Company, and it thereafter executed a similar mortgage to the Grand

Rapids Trust Company, as trustee, securing bonds in the sum of $500,000, a part of which were issued to the holders of the outstanding second-mortgage bonds, thereby retiring them.

On January 10, 1927, Miner S. Keeler and his wife executed and delivered to The Michigan Trust Company, George E. Keeler and Isaac S. Keeler, as trustees, a conveyance of all their right, title and interest in the premises leased by him to the Morton Building Company. George E. Keeler is dead, and the trust company and Isaac S. Keeler are the surviving trustees, and are referred to hereafter as the trustees.

On August 1, 1931, first-mortgage bonds to the amount of $25,000 became due and payable. No provision had been made for payment; $500,000 of this issue were then outstanding. The trustee recognized the seriousness of the situation. Five of the bondholders organized themselves into a committee, and retained plaintiff's present attorneys. A letter, prepared by one of the attorneys but signed by the committee, was sent to the bondholders, in which, after calling attention to the default of the hotel company, not only in the payment of principal and interest on the bonds but to the fact that taxes and ground rent were then due and unpaid, it was said:

"In default of these payments the owners of the land are given the express right by the leases to forfeit the same and to take over the buildings and improvements unless defaults are cured within 90 days after notice by the lessors. It is obvious, therefore, that the security for the first-mortgage bonds consists only of the hotel building and the fixed equipment installed in it, and that if the long-term leases are allowed to be forfeited the security for the bonds will be wholly lost."

The holders of the bonds were urged to place them within the control of the committee and empower it to deal with the lessor and the holders of the second-mortgage bonds in an endeavor to protect their interests. It appears that at the time of the trial bonds to the amount of $342,000 had been so deposited by more than 170 bondholders.

There was default in the payment of ground rent on July 1, 1931. The trustees did not act hastily. On September 26th following, their attorneys wrote the attorneys for the protective committee, reminding them of the default in rental, and also in the payment of taxes, and stated that they had awaited action on the part of the committee "to remedy the existing defaults," and advising them that, unless definite action was taken to do so on or before October 15th next, they would feel obliged "to give notice of termination of the lease or take such other steps as may be deemed necessary to protect the interests of the lessors."

No response having been received thereto, the trustees, on October 23, 1931, served a notice of such defaults on the Grand Rapids Hotel Company, The Michigan Trust Company, trustee, and Grand Rapids Trust Company, trustee, and notified them that, if the default continued for a period of 90 days, they would reenter the premises and the buildings and improvements thereon and take possession thereof as provided for in the lease.

In support of the claim that they were at all times willing to treat the bondholders fairly and to arrive at a satisfactory settlement of the matters in controversy, the trustees, on October 28, 1931, wrote the secretary of the committee, offering to sell the leased property to the committee, or its nominee, for the sum of $260,200. Action thereon was requested

within one week and, if taken by the committee, 30 days would be allowed to make payment and complete the transaction. This offer was, however, subject to the approval of the board of trustees of the trust company, trustee. On November 3, 1931, the attorneys for the committee wrote the trustees that it apparently was impossible to finance the purchase and that the offer could not be accepted.

The 90-day notice given by the trustees expired on January 21, 1932, and on that day the plaintiff, as trustee for the bondholders, filed the bill of complaint herein for the foreclosure of its mortgage. In its prayer for relief it asked for a sale of the mortgaged property. Answers were filed and a hearing had, after which the trial court entered a decree dismissing the bill of complaint, from which the plaintiff has taken this appeal.

The issue presented is whether, under the facts as stated, the title to the hotel building and the fixtures installed therein passed to the lessor, now represented by the trustees, on the termination of the lease.

The rule is well established that the owner of land may by agreement permit another to erect a building thereon and have title thereto as personalty. 1 Tiffany on Real Property (2d Ed.), p. 945; *Kinkead* v. *United States,* 150 U. S. 483 (14 Sup. Ct. 172). This hotel building was erected pursuant to the terms of the lease of the land on which it was built. There is no ambiguity in the language used therein. A consideration for its execution was the erection of the building thereon. Provision was made therein for procuring a part of the cost thereof by a mortgage upon the leasehold interest and the building to be erected thereon. The interest of the lessee therein was pledged to the bondholders under

the trust mortgage to secure the payment thereof. But this interest was subject to the provision in the lease that, in default of the payment of the ground rent, it might be forfeited by notice as therein provided, and on such termination "any and all buildings, structures, fixtures and improvements of every nature and kind, situated on said demised premises, shall be and become the property of the said lessor." This language is so plain that it could not be misunderstood, and that it was not is apparent from the communication above referred to, prepared by one of the plaintiff's attorneys and sent to the bondholders by the protective committee.

The lessee had become the owner of the leasehold interest. It also became the owner of the building it erected thereon, subject to the terms of the lease. It had a right to mortgage the same. The mortgage recited that the interest of the mortgagor was created by the indenture of lease executed by Miner S. Keeler and his wife, duly recorded in the office of the register of deeds of Kent county. In each of the bonds appeared the statement that it was secured by a trust mortgage "on the leasehold estates therein described, and the building situate thereon, as particularly set forth in said indenture of mortgage." The provision in the mortgage, thus referred to in the bonds, will be treated as embodied therein, and it became binding on the purchasers of the bonds. *Morley* v. *University of Detroit,* 263 Mich. 126 (90 A. L. R. 464). They thus became chargeable with notice of the provision in the lease for forfeiture and the passing of the title to the building and fixtures on the termination thereof.

The lessee was under obligation to pay the rent provided for in the lease and the taxes assessed against the property and, had such payments been

made, the lessor must have been satisfied. When the lessee failed to do so, the trustee under the mortgage securing the issue of bonds might have done, so, and the amounts so paid by it to preserve the rights of the bondholders would have been a charge against the lessee as mortgagor. *Taan* v. *American Loan & Trust Co.,* 247 Mich. 683. Opportunity to do so was accorded, but met with no response.

Counsel for the plaintiff urge ''that the object of the various rules of construction is to ascertain and give effect to the intention of the parties,'' and that such intention ''must be found from the contents of the written instrument to be construed, the subject-matter of the contract, the attendant circumstances and the object to be accomplished.''

We find no fault with this statement of the law, nor with the further claim that doubtful or contradictory provisions should be construed, most favorably to the lessee. But when there is no ambiguity in the language used and the intent of the parties is plainly expressed, there is nothing to interpret, and it is the duty of the courts to enforce the contract according to its terms. It seems clear that any intelligent person reading this lease would at once notice that, on default in the payment of the ground rent and taxes, the lessor might serve a notice of forfeiture, and that, on the expiration of the time limited therefor, all of the rights of the lessee would be terminated and the title to the building which it had erected on the land would pass to the lessor.

That a different construction should now be placed upon it is based largely upon the claim of the intent of the lessor as indicated by his becoming a stockholder and president of the lessee and his acting in a somewhat dual capacity as lessor and pres-

ident of the lessee when the lease was executed. It is also urged that he, or his counsel, gave assent to the advertising matter issued at the time the bonds were sold, in which the public was informed that the leasehold interest and the building to be erected thereon were included in the trust mortgage.

While Mr. Keeler took perhaps the leading part in the negotiations with the bank and other business men of the city for the erection of the hotel, and while he personally purchased the land on which it was to be built at a price, the fairness of which is not questioned, there is no indication in the record that he was not at all times acting fairly and in what he believed to be the best interest of the enterprise. But neither the trustee to which the mortgage was made payable nor the purchasers of the bonds had any right to expect that he, or his assigns, would not insist on the ground rent being paid with reasonable promptness, and, if not, that he, or they, would exercise the right given in the lease to forfeit the same and on the conditions therein provided.

Counsel for the plaintiff concede "that, as against the tenant corporation, the landlord had a right of forfeiture." As before stated, the bonds referred to the lease by apt reference to its record. The purchasers thereof were chargeable with notice of its provisions, and have no greater rights than the lessee.

As before stated, the trustees, within a few days after the service of the notice of forfeiture, made an offer to the protective committee to convey the property to it, or to any person it might name, for the sum of $260,200. They renewed this offer at the hearing in this court, and stated that they would accept this amount with interest, and costs to be added thereto.

A decree will be here entered affirming that of the trial court, with costs to the defendants. It may, however, at the option of the plaintiff, contain a provision fixing the amount at which the trustees are now willing to convey, and permitting acceptance of the same within 30 days thereafter.

McDONALD, C. J., and WEADOCK, POTTER, NORTH, FEAD, WIEST and BUTZEL, JJ., concurred.