**GENERAL MOTORS CORP.**, Chevrolet Motor Division, Plaintiff/Counterclaim, Defendant,

v.

The **NEW A.C. CHEVROLET, INC.** d/b/a **NEW A.C. CHEVROLET,** Defendant/Counterclaimant.

No. CIV.98–112.

United States District Court, D. New Jersey.

March 8, 2000.

Alicia Downey, Bingham Dana, LLP, Boston, MA, Lois Goodman, Carpenter, Bennett & Morrissey, Newark, NJ, for Plaintiff.

Martin G. Margolis, Margolis Law Group, P.C., Verona, NJ, for Defendant.

## *OPINION*

HOCHBERG, District Judge.

This matter comes before this Court on a motion for summary judgment filed by General Motors Corp. ("GM") pursuant to Fed.R.Civ.P. 56, seeking judgement in GM's favor on Counts I, II, III, VI, VII, VIII, and IX of the First Amended Complaint and dismissal of the Verified Counterclaim filed by New A.C. Chevrolet, Inc. ("New A.C."). New A.C. also moves for partial summary judgment seeking to dismiss the First Amended Complaint filed by GM. For the reasons set forth below, GM's motion for summary judgment is granted and New A.C.'s motion for partial summary judgment is denied.

Subject matter jurisdiction is properly pled pursuant to 28 U.S.C. § 1330 and § 1332. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims arising under 15 U.S.C. § 1114 and § 1125(c) (the "Lanham Act") that together they form the same case or controversy.

## I. *STANDARD OF REVIEW*

Pursuant to Rule 56(c), a motion for summary judgment will be granted

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, "summary judgment may be granted if the movant shows that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir.1988). All facts and inferences must be construed in the light most favorable to the non-moving party. *See Peters v. Delaware River Port Auth. of Pa. and N.J.*, 16 F.3d 1346, 1349 (3d Cir.1994).

Substantive law controls the inquiry into which facts are "material." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if a reasonable jury could decide the issue in the nonmovant's favor. *Id.* Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.; accord Ridgewood Bd. of Educ. v. M.E.*, 172 F.3d 238, 252 (3d Cir.1999) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

The party seeking summary judgment always bears the initial burden of production. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. This requires the moving party to establish either that there is no genuine issue of fact and that the moving party must prevail as a matter of law, or to demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue on which it bears the burden. *See Id.* at 322–23, 106 S.Ct. 2548. Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party. To avoid summary judgment, the nonmoving party must demonstrate facts supporting each element for which it bears the burden and it must establish the existence of "genuine issue[s] of material fact" justifying trial. *Miller*, 843 F.2d at 143; *see also Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548.

However, at the summary judgment stage, this Court neither weighs the evidence nor makes credibility determinations; these tasks are within the sole domain of the fact-finder. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Therefore, to demonstrate a genuine issue of material fact, the summary judgment opponent need not produce evidence so strong that it mandates a decision in its favor. Rather, the party opposing summary judgement must adduce "evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient." *Id.; see also In re Headquarters Dodge*, 13 F.3d 674, 679 (3d Cir.1993). "Speculation and conclusory allegations do not satisfy this duty." *Ridgewood Bd. of Educ.*, 172 F.3d at 252 (*citing Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995)).

It is clear that if a moving party satisfies its initial burden of establishing a *prima facie* case for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (*quoting First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## II. BACKGROUND

In 1983 New A.C. commenced business as a Chevrolet franchisee. (Affidavit of Onofrio Bruno ("Bruno Aff.") ¶ 2.) In 1986, New A.C. applied to Chevrolet for permission to dual[1] its franchise with a Yugo franchise. (*Id.* at ¶ 5.) Chevrolet granted the request. (*Id.*) However, New A.C. ceased operating the Yugo franchise in the early 1990's and, at that point, operated only the Chevrolet dealership. (*Id.* at ¶ 6.)

The most recent franchise agreement between New A.C. and GM was executed on November 1, 1995. (Bruno Aff. Exh. A.; *see also* Affidavit of Daniel C. Durkin ("Durkin Aff.") Exh. A.) The Dealer Sales and Service Agreement ("Agreement") states, *inter alia,* that

> "[i]f the Dealer wants to make any change in location(s) or Premises, or in the uses previously approved for those Premises, Dealer will give Division written notice of the proposed change together with reasons for the proposal, for Division's evaluation and final decision in light of the dealer network planning considerations. No change in location or in the use of Premises, *including addition of any other vehicle lines,* will be made without Division's prior written authorization."

(Bruno Aff. Exh. A. Art. 4.4.2; *see also* Durkin Aff. Exh. B Art. 4.4.2 (emphasis added).)

On May 6, 1996, New A.C. "sought...approval" from GM for the addition of a Volkswagen franchise to the Chevrolet dealership. (V. Countercl. ¶ 34,

Exh. F.; *see also* Bruno Aff., Exh. L.[2]) New A.C.'s request was denied on June 24, 1996, by GM's Zone Manager. (Durkin Aff. Exh. G.; *see also* Bruno Aff. Exh. M.) GM denied the request because it "generally disfavor[s] dualing of GM lines with the vehicle lines of another manufacturer" and because New A.C.'s performance as a Chevrolet dealer was "substantially deficient." (*Id.* at ¶ 37.) Pursuant to the Agreement. New A.C. sought Management Review of this denial on July 11, 1996. (*See* Durkin Aff. Exh. H.) Management Review was conducted and the decision of the Zone Manager was upheld on August 8, 1996. (*Id.* at Exh. I.)

In a continuing effort to obtain GM's approval to dual its Chevrolet franchise with a Volkswagen franchise, New A.C. sent GM a letter on October 28, 1996, informing GM that "progress...[had] been made" in each of the performance areas that GM had found deficient in its original rejection of New AC's plan. (*Id.* at Exh. J.) New A.C. requested reconsideration of its acquisition of a Volkswagen franchise[3]; GM reiterated its denial on November 15, 1996, and reasserted GM's policy of disfavoring dualing with non-GM lines. (*Id.* at Exh. K.) While acknowledging that New A.C. had made efforts to improve its unsatisfactory performance, GM noted that its denial of New A.C.'s proposal was based on the franchisee's "performance over a period of time, not just a point in time." (*Id.*)

Notwithstanding these extensive communications, GM realized in January, 1997

---

1. To "dual" refers to the automobile industry practice of offering two different vehicle lines for sale from the same location.

2. Although New A.C. now denies requesting GM approval for the acquisition of the Volkswagen franchise, attempting to hang its case on an argument that approval was not required, the record is clear. (*See* V. Countercl. ¶ 34, Exh. F.) New A.C. requested GM's approval and GM expressly objected to acquisition of the Volkswagen franchise by New A.C. and refused to approve the plan.

3. New A.C. has failed to provide this Court with any evidence as to the exact date it began operating the Volkswagen franchise at its Chevrolet premises. Suffice it to say that the factual record indicates New A.C. commenced negotiations with Volkswagen before requesting the required approval from GM and actually added a second franchise without the requisite approval. Having taken this gamble, New A.C. cannot now be heard to complain that GM's failure to approve the acquisition of the Volkswagen franchise caused financial harm to New A.C.

that New A.C. was in fact operating a Volkswagen franchise on its Chevrolet premises despite having been denied permission to dual the vehicle lines. (*Id.* at ¶ 16.) On January 15, 1997, GM notified New A.C. that adding the Volkswagen franchise without prior approval (and, in fact, over express objection) was a breach of the Agreement. (*Id.* at Exh. L.) GM warned New A.C. that "if this serious situation is not satisfactorily resolved or corrected within 30 days from your receipt of this letter, then Chevrolet Motor Division may elect to terminate the Dealer Agreement and cease all business relationships with your dealer company." (*Id.*) Subsequently, New A.C. contacted GM requesting a trial period for its operation of the Volkswagen franchise; GM rejected that suggestion and reminded New A.C. that it was in breach of the Agreement and was risking termination of the franchise. (*Id.*)

Over the following months, New A.C. and GM were in regular oral and written communication regarding New A.C.'s unilateral decision to add a Volkswagen line to the Chevrolet franchise. (*Id.* at ¶ 17–22; *see also* Bruno Aff. ¶ 33–37.) In an effort to resolve the situation without terminating New A.C., GM offered New A.C. the opportunity to be the sole Chevrolet dealer in Jersey City; to dual its Chevrolet franchise with an Oldsmobile franchise; and financial support. (Durkin Aff. Exh. N.) None of GM's offers of a compromise solution successfully resolved the present dispute.

Finally, on January 5, 1998, GM filed a complaint in this Court seeking a declaration that termination of New A.C.'s franchise would not violate the Agreement; the Federal Automobile Dealers Day in Court Act ("ADDCA"), 15 U.S.C. §§ 1221–22; or the New Jersey Franchise Practices Act, N.J.S.A. §§ 56:10–1 *et seq.* New A.C. filed a nine count counterclaim and sought

a preliminary injunction to bar GM from terminating the Agreement. New A.C.'s motion for a preliminary injunction was denied on May 15, 1998, and New A.C.'s franchise was terminated effective on May 20, 1998. Judge Maryanne Trump Barry's May 15, 1998, opinion denying the preliminary injunction directed the parties to agree upon a "work-out schedule"; to complete the winding up of New A.C.'s Chevrolet franchise as a result of the termination of the Agreement.

Notwithstanding Judge Barry's order, New A.C. has not completed all the steps necessary to cease operation as a Chevrolet franchisee. New A.C. continues to display Chevrolet and other GM signage at its prior Chevrolet franchise location, now being operated solely as a Volkswagen dealership. The Agreement states, *inter alia,*

> "[u]pon termination of this Agreement, Dealer agrees to *immediately discontinue* at its expense, all use of Marks. Thereafter, Dealer will not use, either directly or indirectly, any Marks or any other confusingly similar marks in a manner that Division determines is likely to cause confusion or mistake or deceive the public. Dealer will reimburse Division for all legal fees and other expenses incurred in connection with this action to require Dealer to comply with this Article 17.5."

(Bruno Aff. Exh. A. Art. 17.5; *see also* Durkin Aff. Exh. B. Art. 17.5 (emphasis added).) GM sent New A.C. numerous letters demanding that GM's trademarked signage be removed from the New A.C. premises. When New A.C. persisted in displaying the signage, GM sent yet another letter demanding removal and indicating that litigation would be commenced if New A.C. failed to comply with the express terms of the Agreement and continued to display GM trademarked signage.[4]

---

4. Although New A.C. now alleges that a GM representative orally advised it that GM would remove the signage, the Agreement is clear and unequivocal on its face—responsibility for removing the signage was New A.C.'s. Furthermore, the Agreement specifically states

(*See* Affidavit of Alicia L. Downey ("Downey Aff.") Exhs. M., N.) The Chevrolet signage was not removed by New A.C..

On August 25, 1998 GM was granted leave to amend its complaint to add causes of action under the Lanham Act, common law claims for trademark infringement and unfair competition, and a claim for breach of contract and attorney's fees and costs under Article 17.15 of the Agreement, *supra.*

While this was occurring, GM moved to dismiss Counts I and IV through IX of New AC's Counterclaim on August 20, 1998. After reviewing the submissions of the parties, the Court on January 13, 1999 granted GM's motion to dismiss and denied a motion made by New A.C. to amend its counterclaim. Thus, New A.C.'s Counterclaim presently is limited to Counts II and III.

### III. DISCUSSION

At the outset this Court notes that counts IV, V, X, XI, and XII of GM's First Amended Complaint are dismissed as moot.[5] As to the remaining counts of GM's First Amended Complaint, summary judgment is entered in favor of GM on Counts I, II, III, VI, VII, VIII, and IX. The remaining counts of New A.C.'s Coun-

"No agreement between Division and Dealer which relates to matters covered herein, and no change in addition to (except the filling in of blank lines) or erasures of any printed portion of this Agreement will be binding unless permitted under the terms of this Agreement or related documents, or approved in a written agreement executed as set forth in Divisions Dealer Sales and Service Agreement."

(Bruno Aff. Exh. A. Art. 17.11; *see also* Durkin Aff. Exh. B. Art. 17.11.) Finally, New A.C.'s representative, Mr. Nigro, stated in deposition that he was aware of his responsibility to remove the signs. (Bruno Aff. Exh. W. at 127.) Based on the record this Court finds, as a matter of fact, that New A.C. was aware of its obligation to remove GM trademarked signage and simply failed to do so, despite repeated written demands from GM.

5. GM has consented to the dismissal of these counts. Therefore, the Court will not engage

terclaim, Counts II and III, are dismissed with prejudice and judgment on both of these Counts is entered in favor of GM.[6]

*GM Count I:*

Count one of GM's First Amended Complaint seeks a declaratory judgment stating that GM's termination of the Agreement with New A.C. did not breach the Agreement. The Agreement by and between the parties is plain on its face, and the myriad standards of contract interpretation urged on this Court by New A.C. are rejected. *See Barner v. City of Lansing*, 27 Mich.App. 669, 183 N.W.2d 877, 878 (1970) ("It is well established that an unambiguous contract is not subject to construction and must be enforced according to its terms."); *see also Michigan Trust Co. v. Grand Rapids Hotel Co.*, 265 Mich. 328, 251 N.W. 414, 417 (1933) ("But when there is no ambiguity in the language used and the intent of the parties is plainly expressed, there is nothing to interpret,"); *see also Purlo Corp. v. 3925 Woodward Avenue Inc.*, 341 Mich. 483, 67 N.W.2d 684, 686 (1954) ("the only purpose of rules of construction . . . is to enable the court to reach the probable intent of the parties when it is not otherwise ascertainable.").[7] The Agreement states:

in a discussion of the circumstances mooting the claims. (Plaintiff's Brief in Support of its Motion for Summary Judgment ("Plaintiff's Supp. Brief") at 2, fn. 3.)

6. The Court is aware that GM disputes some of the evidence proffered by New A.C. both in support of its motion for summary judgment and in its opposition to GM's motion for summary judgment. However, because the outcome of the motions is the same irrespective of whether the Court considers the disputed evidence, no ruling need be made on the propriety of New A.C.'s submissions. Instead, this Court will consider all the evidence submitted to it by New A.C., noting that many of the submissions in dispute appear elsewhere in the Record.

7. We refer to Michigan law because the parties' Agreement includes an express choice of law provision specifying Michigan law. Except where the parties choice of law conflicts

"[i]f the Dealer wants to make any change in location(s) or Premises, or in the *uses* previously approved for those Premises, Dealer will give Division written notice of the proposed change together with reasons for the proposal, for Division's evaluation and *final decision* in light of the dealer network planning considerations. No change in location or in the use of Premises, *including addition of any other vehicle lines,* will be made without Division's prior written authorization."

(Bruno Aff. Exh. A. Art. 4.4.2; *see also* Durkin Aff. Exh. B. Art. 4.4.2. (emphasis added).) No interpretation of this clause is required beyond the clear and unambiguous language of the contract.

It is undisputed that New A.C., without GM's authorization, added a Volkswagen franchise to the Premises then being used as an exclusive Chevrolet dealership. GM had ample basis for denying New A.C.'s plan to add the Volkswagen franchise to the Chevrolet franchise. Notwithstanding New A.C.'s attempt now to assert that the authorization of GM was not required, the Agreement is plain on its face, its terms are not unreasonable either as written or as enforced, *see Purlo,* 67 N.W.2d at 686; *see also Barner,* 183 N.W.2d at 878; *see also Metropolitan Life Insurance Co. v. Foote,* 95 Mich.App. 399, 290 N.W.2d 158, 160 (1980), and the pattern of the parties'

prior dealing indicates that both parties knew that G.M.'s authorization was required to create a dual distributorship. Thus, New A.C. knew that G.M. retained the right to authorize the addition of any new franchises to the Chevrolet franchise premises. Such a corporate policy disfavoring dualing of brands is not unreasonable.[8] This Court finds, as a matter of fact, that the provision in this case works no injustice and the plain language of the contract will be enforced.[9]

In light of the foregoing facts this Court is compelled to find New A.C.'s acquisition of the Volkswagen franchise over the express objection of GM a material breach sufficient to justify GM's termination of the Agreement. Therefore, GM's decision to terminate did not violate the Agreement.

*GM's Count II:*

█ GM also seeks a declaratory judgment that its termination of the Agreement was not a violation of 15 U.S.C. § 1221–22. This statute, known as the Automobile Dealers Day in Court Act ("ADDCA"), allows automobile dealers to sue the manufacturer for damages resulting from the manufacturer's lack of good faith in "performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling or not

with an express public policy of the state of New Jersey that choice will be respected. *See In re Headquarters Dodge,* 13 F.3d 674, 683 (3d Cir.1993).

8. Indeed, New A.C. has never contended that GM's position disfavoring dualing is unreasonable. Moreover, New A.C.'s Dealer Agreement with Volkswagen includes a virtually identical paragraph which requires New A.C. to obtain Volkswagen's permission before dualing the Volkswagen franchise with any automobile line other than the then existing Chevrolet line. (*See* Downey Aff. Exh. E. ¶ 8; Exh. K. ¶ 5.)

9. This Court rejects New A.C.'s effort to redefine the term "Premises" to avoid the clear meaning of this contractual provision. The "Premises" is clearly the dealership property

being operated as an exclusive Chevrolet franchise as defined in the Location and Premises Addendum to General Motors Corporation Dealer Sales and Service Agreement ("Addendum"). (*See* Durkin Aff. Exh. C.) GM's decision to denominate minimum requirements governing the display of Chevrolet vehicles, *et cetera,* does not alter the fact that the "Premises" included all dealership property located at 3085 Kennedy Boulevard, Jersey City, New Jersey. This Court o is also unpersuaded by New A.C.'s assertion that a breach of Article 4.4.2 of the Agreement is non-material because it is not specifically set forth as a material breach in Article 13 of the Agreement. New A.C. fails to note Article 13.1.13 which refers to "[a]ny other material breach of Dealer's obligations under this Agreement not otherwise identified in this Article or in Article 14." (Bruno Aff. Exh. A.; *see also* Durkin Aff. Exh. B.)

renewing a franchise." 15 U.S.C. § 1222. Bad-faith is defined narrowly as "coercion, intimidation, or threats of coercion or intimidation." 15 U.S.C. § 1221(e); *see also Arnold Pontiac–GMC, Inc. v. General Motors Corp.*, 786 F.2d 564, 579 (3d Cir. 1986) ("the case law plainly requires actual coercion or intimidation as an element of an ADDCA claim."). This Court finds that GM's termination of the Agreement does not involve coercion or intimidation. Moreover, not one of New A.C.'s submissions to this Court contains any factual basis to claim coercion or intimidation by GM. New A.C.'s counterclaim alleging a violation of the ADDCA by GM was previously dismissed for failure to state a claim on which relief can be granted in Judge Barry's January 13, 1999 Order. Based on the foregoing, GM's request for declaratory judgment is granted.

*GM's Count III and New AC's Counts II and III:*

■ GM seeks a declaratory judgment that termination of the Agreement was not a violation of N.J.S.A. 56:10–1 *et. seq.*, the New Jersey Franchise Practices Act ("NJFPA"), and New A.C. seeks a decision that GM's termination of the Agreement was a violation of the NJFPA. New A.C. claims that the termination was without good cause and that the Agreement imposed an unreasonable standard of performance upon New A.C.

■ The Act's definition of "good cause" does not support New A.C.'s claim:

"It shall be a violation of this act for a franchisor to terminate, cancel or fail to renew a franchise without good cause. For the purposes of this Act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to *failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise.*"

N.J.S.A. 56:10–5 (emphasis added). As has been discussed at length above, New A.C.'s decision to add a Volkswagen franchise to the location and premises devoted to the Chevrolet franchise without GM's authorization was a failure to substantially comply with the terms of the Agreement. "[S]ubstantial compliance" is surely something less than absolute adherence to every nuanced term of an agreement, but substantial compliance—at a minimum—requires that the franchisee refrain from acting in direct defiance of a term of the Agreement. This is especially true when, as here, the franchisee has received specific notice from the franchisor that its behavior is a violation of the agreement. *See Jiffy Lube Int'l Inc. v. Weiss Bros., Inc.*, 834 F.Supp. 683, 689 (D.N.J.1993) ("a franchisee's failure to comply with the terms of the franchise agreement justifies termination of the agreement by the franchisor"); *see also Dunkin' Donuts of America v. Middletown Donut Corp.*, 100 N.J. 166, 495 A.2d 66, 72 (1985). This Court finds that, under the facts of this case, New A.C.'s unilateral unauthorized decision to dual market Chevrolet and Volkswagen constitutes "good cause" to justify termination. *See Brattleboro Auto Sales, Inc. v. Subaru of New England, Inc.*, 633 F.2d 649, 652 (2d Cir.1980); *see also Simonds Chevrolet, Inc. v. General Motors Corp.*, 564 F.Supp. 151 (D.Mass.1983) (plan to dual franchise a reasonable criterion used by manufacturer to reject a proposed purchaser).[10]

---

10. New A.C.'s argument that attacks GM's true motive for termination is irrelevant and unpersuasive as a basis to avoid the consequences of its own breach of the Agreement. *See Karl's Sales & Service. Inc. v. Gimbel Bros., Inc.*, 249 N.J.Super. 487, 592 A.2d 647, 651 (App.Div.1991); ("where the right to terminate a contract is absolute under the wording in an agreement, the motive of a party in terminating such an agreement is irrelevant to the question of whether the termination is effective"); *see also Major Oldsmobile Inc. v. General Motors Corp.*, No. 95–7595, 1996 WL 280452, 1996 U.S.App. LEXIS 11443, at *7–8 (2d Cir. May 17, 1996) ("[W]e reject Major's contention that General Motors was precluded from terminating the Dealer Agreement because it had 'wrongful' motives for the termination ... even if there were such ulterior motives on the part of General Motors, these

New A.C.'s counterclaim alleges that the terms of the Agreement imposed upon New A.C. unreasonable standards of performance in violation of the NJFPA. Although New A.C.'s brief in opposition to GM's motion for summary judgment does not address this issue, the Court finds that GM is entitled to summary judgment on this claim. Facts have not been adduced to demonstrate that the standards imposed upon New A.C. by the Agreement are unreasonable. GM has provided ample evidence demonstrating the reasonableness of the requirements under the Agreement *and* of its continual attempts to support and assist the New A.C. franchise in complying with the Agreement. Based on the factual record, summary judgment on this count will be entered in favor of GM.

*GM Counts VI, VII and VIII:*

■ GM alleges that New A.C.'s continued display of GM trademarked signage constitutes a violation of 15 U.S.C. § 1114[11] and § 1125(a)[12] ("the Lanham Act") and common law trademark infringement and unfair competition. This Court agrees. In order to prevail on a claim of trademark infringement under 15 U.S.C. § 1114 a plaintiff must prove: (1) that the marks in question are valid and legally protectable, (2) that plaintiff owns the marks, and (3) that defendant's use of the marks is likely to create confusion concerning the origin of the product or service. *Opticians Association of America v. Independent Opticians of America,* 920 F.2d 187, 192 (3d Cir.1990); *Birthright v. Birthright, Inc.,* 827 F.Supp. 1114, 1134 (D.N.J.1993). New A.C. does not dispute that the marks at issue in this case are valid and legally protectable, nor that GM owns the marks. Therefore, to prevail on its trademark infringement claim under federal law, GM need only show that New A.C.'s use of the marks is likely to create confusion regarding the origin of the product or service. *See Aero–Motive Co. v. U.S. Aeromotive, Inc.,* 922 F.Supp. 29, 35 (W.D.Mich., 1996) ("Under federal law, proof of likelihood of confusion is all that is required to subject a trademark or trade name infringer to civil liability.").

■ GM advances its case by asserting that the marks currently being displayed by New A.C. are identical to the protected marks used by GM. *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 142

---

motives would not have affected its right to terminate the Dealer Agreement. As long as a party has 'the legal right to terminate its obligation under the contract, it is legally irrelevant whether [the party] was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract.' ") (*quoting Refinement Int'l Co. v. Eastbourne N.V.,* 815 F.Supp. 738, 742 (S.D.N.Y.1993)).

11. 15 U.S.C. § 1114 provides in relevant part:
(1) Any person who shall, without the consent of the registrant—
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services ... which use is likely to cause confusion, or to cause mistake, or to deceive; or
(b) reproduce, counterfeit, copy or colorably imitate a registered mark and apply such ... to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribu-

tion, or advertising of goods or services on or in connection with which such is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant ...

12. 15 U.S.C. § 1125(a) provides in relevant part:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, ... which

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

(3d Cir.1981) ("there is a great likelihood of confusion when an infringer uses the exact trademark..."); *Opticians,* 920 F.2d at 195 ("likelihood of confusion is inevitable, when, as in this case, the identical mark is used concurrently by unrelated entities."); *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 376 (3d Cir.1992) (risk of consumer confusion likely where a franchisee continues to use the franchisor's trademark after termination of the franchise); *Two Men and a Truck/Int'l, Inc. v. Two Men and a Truck/Kalamazoo Inc.,* No. 5:94–cv–162, 1995 WL 549278, 1995 U.S. Dist. LEXIS 11295, at * 12–13 (W.D.Mich. July 24, 1995) ("The law is well settled that continuing to use a franchise mark after the franchise relationship has been terminated is a violation of the Lanham Act.") (Internal quotations omitted.). This Court finds that New A.C. is currently displaying marks that are the valid, legally protectable property of GM, and it has persisted in displaying those marks despite repeated warnings from GM that the use of the marks after termination was a violation of GM's trademark.

Moreover, New A.C. admits that the use of the marks in fact causes confusion among consumers. (Bruno Aff. ¶ 54.) New A.C. acknowledges that Chevrolet customers are still requesting that their automobiles be serviced at New A.C., which is no longer authorized by GM to make repairs to its vehicles. (New A.C. must refer these customers to the nearest GM dealership.) Thus, confusion is actually resulting from New A.C.'s continued use of GM's marks. GM has carried its burden of proving trademark infringement. *See Opticians Association of America,* 920 F.2d at 195; *see also Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center,* 109 F.3d 275, 284 (6th Cir. 1997) ("If the goods directly compete, 'confusion is likely if the marks are sufficiently similar.' ") (*quoting Homeowners Group v. Home Marketing Specialists,* 931 F.2d 1100, 1108 (6th Cir.1991)).

New A.C. responds with a semantic argument that, because it is no longer offering GM cars for sale, its use of the GM trademarked signage is not "in connection with...the sale...of goods or services...". New A.C.'s argument is unpersuasive. New A.C. is continuing to offer Volkswagen automobiles for sale from the same facility currently displaying GM's trademarked signage, and customers are telephoning seeking GM services. "Cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports. Such cases are 'open and shut' and do not involve protracted litigation to determine liability for trademark infringement." 2 McCarthy § 23:3; *accord Birthright,* 827 F.Supp. at 1136. *See Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir.1978) (likelihood of confusion exists "when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark."). In this case, GM has proven that there is a high likelihood that consumers will associate New A.C.'s dealership with Chevrolet sales and services.

■ Having concluded that New A.C. is violating 15 U.S.C. § 1114, this Court also concludes that New A.C. is violating 15 U.S.C. § 1125. The test under this provision of the Lanham Act is: (1) whether GM's trade name is distinctive and protectable and, (2) whether New A.C.'s actions in using the name cause a likelihood of confusion among the relevant public. *Birthright,* 827 F.Supp. at 1136. This test is broader in scope than the test for trademark infringement under 15 U.S.C. § 1114. Therefore, courts have held that "since trademark infringement is a narrower concept, any finding that it has occurred will, by necessity, support an additional finding that the defendant is also guilty of unfair competition." *Id.* (*quoting Nugget Distrib. Co-op v. Mr. Nugget, Inc.,* 776 F.Supp. 1012, 1024 (E.D.Pa.1991)); *ac-*

cord *Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 604 (6th Cir. 1991). GM's marks are registered; the marks therefore deserve protection under the Lanham Act; and New A.C.'s continued use of the GM trademarked signage after the termination of the franchise agreement causes a substantial likelihood of confusion among the public. Therefore, New A.C. is in violation of 15 U.S.C. § 1125 and GM is entitled to summary judgment on Counts VI and VII.

 Finally, the standard for common law trademark infringement and unfair competition in both New Jersey and Michigan mirrors the standards embodied in the Lanham Act.[13] *SK&F Co. v. Premo Pharmaceutical Labs., Inc.*, 625 F.2d 1055, 1065–66 (3d Cir.1980). Therefore, for the reasons stated above, this Court finds that New A.C. has engaged in common law trademark infringement and unfair competition. GM is, therefore, entitled to summary judgment on Count VIII of its First Amended Complaint.

*GM Count IX:*

 GM seeks attorney's fees and costs associated with the pursuit of its trademark claims against New A.C. The request is granted, based upon the clear language of the Agreement between the parties which provides:

> "[u]pon termination of this Agreement, Dealer agrees to immediately discontinue at its expense, all use of Marks. Thereafter, Dealer will not use, either directly or indirectly, any Marks or any other confusingly similar marks in a manner that Division determines is likely to cause confusion or mistake or deceive the public. *Dealer will reimburse Division for all legal fees and other expenses incurred in connection with this action to require Dealer to comply with this Article 17.5.*"

13. Both parties have briefed this issue under New Jersey state law, notwithstanding their choice of Michigan law in the Agreement.

(Bruno Aff. Exh. A. Art. 17.5; *see also* Durkin Aff. Exh B. Art. 17.5.)

Having found that the Agreement does not impose any unfair standards on New A.C. and having further found that New A.C. is liable for trademark infringement and unfair competition under both state and federal law, this Court will enforce the parties' Agreement as written. This result is in accord with Michigan state law as well as the state law and public policy of New Jersey.

## IV. CONCLUSION

For the reasons stated above this court grants GM's motion for summary judgment and denies New A.C.'s motion for partial summary judgment. The parties shall submit to this Court briefs regarding the appropriate measure of damages, the amount of time New A.C. is granted to remove the GM signage from its premises, and whether New A.C. is entitled to compensation for the signage from GM under the NJFPA. An appropriate Order will issue.

The Court has researched Michigan state law and concludes that the outcome is the same under the law of both states.